# No. 24-1988

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

**ERIC WEINBERG, *on behalf of themselves and all others
similarly situated*, ROBERT SUDAKOW, *on behalf of
themselves and all others similarly situated*, JOANNE
SUDAKOW, *on behalf of themselves and all others
similarly situated* ,**

*Plaintiffs-Appellees,*

v.

**CLEANCHOICE ENERGY, INC.,**

*Defendant-Appellant.*

On Appeal from the
United States District Court for the
Southern District of New York
No. 7:23-cv-09685
Hon. Philip M. Halpern

## APPELLANT'S BRIEF

Michael D. Matthews, Jr.
Diane S. Wizig
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
(713) 337-5580
matt.matthews@mhllp.com
diane.wizig@mhllp.com

Justin R. Chapa
MCDOWELL HETHERINGTON LLP
1000 Ballpark Way, Suite 209
Arlington, TX 76011
(817) 631-7561
justin.chapa@mhllp.com

*Attorneys for Defendant/Appellant
CleanChoice Energy, Inc.*

## CORPORATE DISCLOSURE STATEMENT

CleanChoice Energy, Inc. is a wholly owned subsidiary of CCE Holdings, Inc., which is majority owned by funds managed by True Green Capital Management LLC. Each of these entities is privately held and no publicly held corporation owns 10% or more of their stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

JURISDICTIONAL STATEMENT .................................................................. viii

ISSUE PRESENTED ...................................................................................... ix

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF THE CASE .......................................................................... 3

    A.    Nature of the Case and Procedural Background .................................... 3

    B.    Statement of the Facts ........................................................................ 5

        1.    Mrs. Sudakow Enrolled in a Variable-Rate Electricity Supply Contract with CleanChoice. ......................................................... 6

        2.    Mr. Weinberg Enrolled in a Fixed-Rate Electricity Supply Contract with CleanChoice that Later Renewed on a Month-to-Month Basis at a Variable Rate. ............................................... 10

        3.    A Class Action Suit Is Filed Against CleanChoice, with Mrs. Sudakow, Mr. Sudakow, and Mr. Weinberg as Representative Plaintiffs. ..................................................................................... 11

        4.    CleanChoice Moves to Compel Arbitration. ............................. 11

        5.    The District Court Grants CleanChoice's Motion to Compel Arbitration as to Mr. Weinberg but Not as to Mrs. Sudakow. . 14

SUMMARY OF THE ARGUMENT ...................................................... 15

STANDARD OF REVIEW AND ARBITRATION LAW ...................................... 17

ARGUMENT ............................................................................................. 20

    A.    A Valid and Enforceable Arbitration Provision Exists and Contractually Binds Mrs. Sudakow to Arbitrate Disputes with CleanChoice. ....................................................................................... 21

1.      The Record Establishes That CleanChoice Mailed the Contract
        Containing the Arbitration Provision to Mrs. Sudakow, and She
        Failed to Rebut the Presumption that She Received It. ...........22

2.      Mrs. Sudakow Implicitly Assented to the Terms and
        Conditions of the Sudakow Contract, Including the Arbitration
        Provision. ..................................................................................37

B.      Because the Contract Incorporates the AAA Rules, Any Further
        Objections to Arbitration Must Be Submitted to the Arbitrator. ........41

CONCLUSION ......................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*,
    282 F.3d 92 (2d Cir. 2002) ................................................................38

*In re Am. Express Fin. Advisors Sec. Litig.*,
    672 F.3d 113 (2d Cir. 2011) ............................................................18

*Amaya v. Spark Energy Gas, LLC*,
    2016 WL 1410755 (N.D. Cal. Apr. 11, 2016)...................................25

*Basile v. Stream Energy Pa., LLC*,
    2016 WL 4611443 (M.D. Pa. Sept. 6, 2016)......................................25

*Bassett v. Elec. Arts Inc.*,
    2015 WL 1298644 (E.D.N.Y. Feb. 9, 2015) ......................................41

*Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*,
    361 N.E.2d 999 (N.Y. Ct. App. 1977)................................................40

*Contec Corp. v. Remote Sol., Co.*,
    398 F.3d 205 (2d Cir. 2005) ..............................................................41

*Dzanoucakis v. Chase Manhattan Bank USA, N.A.*,
    2009 WL 910691 (S.D.N.Y. Mar. 31, 2009).......................................27

*Edmundson v. Klarna, Inc.*,
    85 F.4th 695 (2d Cir. 2023) ........................................................17, 31

*FDIC v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*,
    205 F.3d 66 (2d Cir. 2000) ................................................................26

*Ferrie v. DirectTV, LLC*,
    2016 WL 183474 (D. Conn. Jan. 12, 2016) ...............................*passim*

*Forte v. Direct Energy Servs.*,
    2017 WL 3495861 (N.D.N.Y. Aug. 14, 2017)....................................24

*Fritz v. N. Am. Power & Gas, LLC*,
    2015 WL 13841606 (D. Conn. Oct. 29, 2015)....................................25

iv

*Gorecki v. Clearview Elec., Inc.*,
   338 F. Supp. 3d 470 (W.D. Pa. 2018)................................................................25

*Hartford Acc. and Indem. Co. v. Swiss Reinsurance Am. Corp.*,
   246 F.3d 219 (2d Cir. 2001) .............................................................................20

*Hartranft v. Encore Capital Grp.*,
   543 F. Supp. 3d 893 (S.D. Cal. 2021)...............................................................40

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   586 U.S. 63 (2019).............................................................................19, 41, 43

*Holick v. Cellular Sales of N.Y., LLC*,
   802 F.3d 391 (2d Cir. 2015) .........................................................................18, 19

*Howard v. Ferrellgas Partners, L.P.*,
   92 F. Supp. 3d 1115 (D. Kan. 2015).............................................................*passim*

*James v. Comcast Corp.*,
   2016 WL 4269898 (N.D. Cal. Aug. 15, 2016) ...................................................30

*Kasparov v. Ambit Texas, LLC*,
   2016 WL 6779497 (E.D.N.Y. Nov. 16, 2016) ...................................................31

*Krohn v. Spectrum Gulf Coast, LLC*,
   2019 WL 4572833 (N.D. Tex. Sept. 19, 2019) ..................................................26

*Lacour v. Marshalls of CA, LLC*,
   2021 WL 1700204 (N.D. Cal. Apr. 29, 2021)....................................................38

*Landau v. Viridian Energy PA LLC*,
   223 F. Supp. 3d 401 (E.D. Pa. 2016)................................................................25

*Larsen v. Citibank FSB*,
   871 F.3d 1295 (11th Cir. 2017) ........................................................................27

*Leon v. Murphy*,
   988 F.2d 303 (2d Cir. 1993) .............................................................................24

*Manigault v. Macy's East, LLC*,
   318 F. App'x 6 (2d Cir. 2009) ..........................................................................23

*Marshall v. Verde Energy USA, Inc.*,
2020 WL 5905072 (D.N.J. Oct. 5, 2020) ...........................................25

*Martinez v. Agway Energy Servs.*,
2022 WL 306437 (N.D.N.Y. Feb. 2, 2022)........................................24

*Maynez v. Walmart, Inc.*,
479 F. Supp. 3d 890 (C.D. Cal. 2020) ..............................................40

*Meckel v. Cont'l Res. Co.*,
758 F.2d 811 (2d Cir. 1985) .............................................................27

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ...............................................17, 22, 24

*Mirkin v. Viridian Energy, Inc.*,
2016 WL 3661106 (D. Conn. July 5, 2016) .......................................25

*Mobile Real Estate, LLC v. NewPoint Media Grp.*,
460 F. Supp. 3d 457 (S.D.N.Y. 2020) ........................................19, 41

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)...............................................................................18

*Okeechobee Resorts, LLC v. EZ Cash Pawn, Inc.*,
145 So.3d 989 (Fla. Ct. App. 2014).................................................29

*Oppenheimer & Co. v. Neidhart*,
56 F.3d 352 (2d Cir. 1995) ...............................................................27

*PaineWebber Inc. v Bybyk*,
81 F.3d 1193 (2d Cir. 1996) ........................................................19, 40

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010).......................................................................19, 42

*Ross v. Am. Express Co.*,
478 F.3d 96 (2d Cir. 2007) ...............................................................22

*Schafer v. Direct Energy Servs.*,
481 F. Supp. 3d 141 (W.D.N.Y. 2020) *vacated and remanded on other grounds*, 845 F. App'x 81 (2d Cir. 2021) ...............................28

*Schnabel v. Trilegiant Corp.*,
  2011 WL 797505 (D. Conn. Feb. 24, 2011), *aff'd*, 697 F.3d 110
  (2d Cir. 2012)................................................................................*passim*

*Specht v. Netscape Commc'ns Corp.*,
  306 F.3d 17 (2d Cir. 2002) ...............................................................17, 23

*Starke v. SquareTrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019) ....................................................................23

*Valle v. ATM Nat'l., LLC*,
  2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) .....................................24, 27, 28, 30

*Weinberg v. CleanChoice Energy, Inc.*,
  2024 WL 3446515 (S.D.N.Y. July 17, 2024)..................................*passim*

*Wright v. Greensky, Inc.*,
  2021 WL 2414170 (S.D. Fla. June 14, 2021)...................................26, 27, 40

*Yoshida v. Vista Energy Mktg. LP*,
  2022 WL 88505 (E.D. Cal. Jan. 7, 2022) ....................................3, 28, 40

*Zachman v. Hudson Valley Fed. Credit Union*,
  49 F.4th 95 (2d Cir. 2022) ...............................................................18, 19

## Statutes

Federal Arbitration Act, 9 U.S.C. §§ 1-16................................................18, 41, 42

N.Y. Gen. Bus. Law §§ 349, 349-d(3), 349-d(7)..................................4, 15

N.Y. Gen. Bus. Law § 349-d(1)(b) .........................................................5

N.Y. Gen. Bus. Law § 349-d(6)................................................................38

## Other Authorities

Fed. R. Civ. P. 12(b) ...........................................................................4, 5

# JURISDICTIONAL STATEMENT

The District Court had statutory jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the putative class are alleged to exceed the sum or value of $5,000,000, the putative class has more than 100 members, and diversity of citizenship exists between at least one member of the putative class and CleanChoice. JA-033.

This Court has jurisdiction of this interlocutory appeal under the Federal Arbitration Act ("FAA"), which provides that an appeal may be taken from an order "denying a petition under section 4 of this title to order arbitration to proceed." 9 U.S.C. § 16(a)(1)(B). The District Court entered an Opinion and Order denying CleanChoice's Motion to Compel Arbitration on July 17, 2024. *Weinberg v. CleanChoice Energy, Inc.*, 2024 WL 3446515 (S.D.N.Y. July 17, 2024); JA-001–25. CleanChoice filed a timely notice of appeal seven days later on July 24, 2024. JA-283–84.

## ISSUE PRESENTED

Did the District Court err in declining to enforce the unambiguous, mandatory arbitration provision in Plaintiff/Appellee Joanne Sudakow's contract with CleanChoice, where: the provision delegates the issues of contract-validity and arbitrability to the arbitrator; CleanChoice offered unrebutted evidence that the contract was mailed to and presumptively received by Appellee—at the same address used for her enrollment and billing—before her electricity supply service began; and Appellee offered only conclusory affidavit testimony from *her husband* stating that they do not remember receiving the contract?

## PRELIMINARY STATEMENT

Joanne Sudakow contracted with CleanChoice Energy to supply electricity to her home after she received a CleanChoice solicitation in the mail in 2021. Two years later, she and her husband Robert Sudakow—and another CleanChoice customer, Eric Weinberg—sued CleanChoice over the renewable character of the electricity it supplied and the rates it charged under contracts with mandatory arbitration provisions.

CleanChoice sent Mrs. Sudakow and Mr. Weinberg their contract terms and conditions by mail after their enrollment processing. Mrs. Sudakow enrolled by returning a copy of the mailer CleanChoice sent her, while Mr. Weinberg enrolled over the telephone. But the contracts they received in response were the same in important respects. They allowed for penalty-free rescission and did not initiate electricity supply until the local utility processed the service request and the rescission period ended—in Mrs. Sudakow's case, weeks after her contract was mailed to her. And after that, the contracts still allowed the customers to cancel at any time without any fee or penalty. The contracts also contained identical, mandatory arbitration clauses in which the parties agreed to resolve disputes outside of court under the rules of the American Arbitration Association ("AAA") and to delegate to an arbitrator any threshold issues like validity and arbitrability.

1

When CleanChoice moved to enforce those provisions, the District Court ordered Mr. Weinberg to arbitration, but not Mrs. Sudakow—even as the District Court acknowledged that the arbitration provision was not a material change to Mrs. Sudakow's enrollment agreement and that she had not raised hardship arguments.

The District Court erred. Its decision to allow Mrs. Sudakow to avoid arbitration was based primarily on the fact that Mr. Weinberg learned during his telephone enrollment that a finalized contract would be mailed to him, but the hardcopy documents that Mrs. Sudakow first received in the mail (before returning her enrollment form) did not mention a forthcoming finalized contract. That distinction is legally irrelevant under the circumstances. Contract law imposes no requirement that parties must give advance notice before proposing amendments or that they must expressly provide for amendment-proposal procedures. The information CleanChoice gave Mr. Weinberg does not make its amendment of Mrs. Sudakow's separate contract terms ineffective.

Under longstanding "mailbox rule" precedent, moreover, CleanChoice carried its burden to show that Mrs. Sudakow presumptively received the final contract (at the address she directed it to use) by offering unrebutted evidence of its enrollment processing and contract mailing practices, including specifically as to Mrs. Sudakow. Mrs. Sudakow cannot dispel that presumption—as a matter of law— through **her husband's** bare affidavit assertion that "we" do not remember receiving

the final contract in the mail, or by trying to suggest that Mr. Weinberg's independent experience establishes an actual-notice standard that CleanChoice had to meet as to her. Clean Choice was only required to show that Mrs. Sudakow was on inquiry notice, which it did, and Mrs. Sudakow did not rebut.

Courts routinely affirm the validity of amendments to consumer contracts where businesses mail revised terms to their customers that allow for an opt-out period and tacit acceptance, including in the arbitration context. *See, e.g.*, *Yoshida v. Vista Energy Mktg. LP*, 2022 WL 88505, at *4 (E.D. Cal. Jan. 7, 2022) (enforcing arbitration agreement in similar case; rejecting argument against validity of contract mailed after enrollment).

CleanChoice did exactly that here, but the District Court essentially held it to a heightened actual-notice standard, where the law requires only inquiry notice. CleanChoice respectfully asks the Court to reverse the District Court's order as to Mrs. Sudakow and remand with instructions to order all of this case to arbitration.

## STATEMENT OF THE CASE

### A.    Nature of the Case And Procedural Background

Plaintiffs Eric Weinberg, Joanne Sudakow, and Robert Sudakow filed a putative class action against CleanChoice in the Southern District of New York, which was assigned to the Honorable Philip M. Halpern. Plaintiffs allege that CleanChoice engaged in deceptive and bad faith pricing and marketing practices that

caused consumers in New York, New Jersey, Pennsylvania, Delaware, Ohio, Maryland, Washington, D.C., and Illinois to purportedly pay increased rates and to be misled regarding the nature of their renewable electricity. Plaintiffs assert claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violations of New York General Business Law §§ 349, 349-d(3), 349-d(7), violations of state consumer protection statutes, and unjust enrichment.

CleanChoice moved to compel arbitration based on the mandatory arbitration provision contained in Mr. Weinberg's and Mrs. Sudakow's respective contracts, which were mailed to them by CleanChoice following enrollment for renewable electricity services. CleanChoice also moved to dismiss on various grounds under Rule 12(b), including that Mr. Sudakow lacked standing.

The District Court decided CleanChoice's motions on the papers in its Opinion and Order of July 17, 2024 (the "Order"). *Weinberg v. CleanChoice Energy, Inc.*, 2024 WL 3446515 (S.D.N.Y. July 17, 2024); JA-001–25. The Order granted CleanChoice's motion to compel arbitration as to Mr. Weinberg's claims, but not Mrs. Sudakow's claims. *Id.* at *5–8, 11; JA-009–16; JA-024. In relevant part, the District Court concluded that Mrs. Sudakow did not have notice of the terms and conditions sent to her by CleanChoice following her enrollment and did not assent to arbitration. *Id.* at *7–8; JA-014–16. The District Court granted CleanChoice's

4

Rule 12(b) motion in part, dismissing Mr. Sudakow for lack of standing and dismissing Plaintiffs' claims for injunctive relief. *Id*. at *11; JA-024.

CleanChoice timely filed its Notice of Appeal on July 24, 2024, appealing the portion of the District Court's Order denying its motion to compel arbitration of Mrs. Sudakow's claims.

### B.    Statement of the Facts

CleanChoice is a licensed energy services company ("ESCO") that provides renewable electricity to consumers in deregulated electricity markets across the United States, including New York. *See* JA-002. Although New York residents historically purchased electricity from their local utility, the New York Public Services Commission (the "PSC") deregulated the market for retail electricity supply in the 1990s. *See* JA-034; JA-102–103. In doing so, the PSC sought to give consumers the option to buy electricity from any licensed ESCO, with the local, regulated utility (like ConEdison) still delivering the commodity to the customer. JA-103; *see also* N.Y. GEN. BUS. LAW § 349-d(1)(b) (defining "Energy Services Company"). Alternatively, consumers could stay with their utility and receive prices set by the utility and regulated by the PSC. *See* JA-035; JA-103. Unlike the regulated utility, ESCOs like CleanChoice are not required to seek approval for the electricity rates they charge or the methods by which they set their rates. JA-035; JA-103. Under this deregulated electricity market structure, consumers (not regulators)

decide whether a product sold by an ESCO is competitive. JA-103. If a consumer believes a more suitable product is available, the consumer can switch back to the utility or to another ESCO of their choice. JA-103.

### 1. Mrs. Sudakow Enrolled in a Variable-Rate Electricity Supply Contract with CleanChoice.

In September 2021, Mrs. Sudakow received a direct mailer from CleanChoice at her home address offering her renewable electricity at a variable rate (the "Direct Mailer"). JA-003; JA-045–46; JA-091–94; JA-104; JA-117. The Direct Mailer was comprised of three documents: a marketing disclosure summarizing the proposed terms and conditions of the electricity supply agreement, a frequently asked questions sheet, and an enrollment authorization form. JA-091–94.

The marketing disclosure stated, *inter alia*, that the "Customer Disclosure Statement, Terms and Conditions and the enrollment authorization, constitutes an agreement between CleanChoice . . . and the undersigned customer . . . under which Customer shall initiate electricity service and begin enrollment with CleanChoice." JA-092. It also said that the "Documents constitute the entire Agreement between Customer and CleanChoice with regard to Customer's purchase of electric commodity and other related services." JA-092. Notably, the enrollment authorization form stated (just above the signature line) that the customer could rescind enrollment within three business days of mailing it in. JA-189.

Sometime in October 2021, Mrs. Sudakow's husband signed the enrollment authorization form on his wife's behalf and mailed it back to CleanChoice. *See* JA-45–46; JA-117. Upon receiving the signed form, which "authorize[d] CleanChoice to enroll [her] address" shown on the form, CleanChoice enrolled Mrs. Sudakow in a variable-rate electricity plan. JA-117. Following its standard business practices, CleanChoice directed its mailing vendor, Automated Mailing, Inc. ("AMi"), to send Mrs. Sudakow a welcome package back to the same address (the "Welcome Package"). JA-209; JA-217–18; JA-255; JA-257–266. CleanChoice's business records indicate that AMi mailed the Welcome Package on or about November 17, 2021, JA-255, to the address Mr. Sudakow directed CleanChoice to use inside an envelope that prominently stated that "Important information" about her enrollment was enclosed:



Joanne Sudakow
131 Higby Rd
Utica, NY 13501-6546

Important information regarding your new clean electricity subscription.

JA-217–18; JA-255; JA-257–266.

The Welcome Package included a copy of Mrs. Sudakow's variable-rate contract, with its full terms and conditions. JA-257–266. It was conspicuously titled "New York Residential and Small Commercial Sales Agreement" (the "Contract"),

JA-260, and comprised six of the nine pages contained in the envelope, JA-257–265. Although Mr. Sudakow later claimed that he and his wife do not remember receiving the Welcome Package, JA-176–177, Mrs. Sudakow herself has not denied or otherwise disputed receiving it. CleanChoice began supplying electricity to Mrs. Sudakow's residence the following month, on December 8, 2021. JA-198; *see also* JA-047.

The Contract provides the full terms and conditions of Mrs. Sudakow's agreement and, among other things, explains that it supersedes any prior written terms—including the proposed terms and conditions that Mrs. Sudakow received as part of the Direct Mailer:

> TERMS AND CONDITIONS
> Agreement to Sell and Purchase Energy
> **This Customer Disclosure Statement, Terms and Conditions, together with the enrollment authorization** ("Enrollment Authorization") . . . **constitutes an agreement between CleanChoice Energy, Inc. . . . and the undersigned customer** . . . under which You shall initiate service and begin enrollment with CleanChoice Energy (the "Agreement").
>
> \*     \*     \*
>
> This Agreement, along with Your enrollment authorization or renewal letter, **constitutes the entire Agreement with CleanChoice Energy and supersedes any oral or written statements made in connection with this Agreement** or Your electricity supply.

JA-138–141 (emphasis added); *see also* JA-260–263. Thus, the terms and conditions of the Contract along with the signed enrollment authorization constitute the entire

agreement between Mrs. Sudakow and CleanChoice, and supersede the summary of the proposed terms and conditions in the Direct Mailer. JA-138–141; JA-260–263.

The Contract also has a broad arbitration clause, pursuant to which Mrs. Sudakow irrevocably and unconditionally agreed to arbitrate any related actions, complaints, or disputes under AAA rules ("Arbitration Provision"):

> Choice of Laws
> This Agreement will be governed by the laws of the state of New York without regard to the application of its conflicts of law principles. **Both You and CleanChoice Energy agree <u>irrevocably and unconditionally to settle any actions, complaints or disputes relating to this contract</u> or the transactions contemplated by this contract <u>under the rules of the American Arbitration Association (AAA)</u>**. It is further agreed that arbitration will only be pursued on an individual basis. This Agreement does not allow class, representative or collective arbitration even if the AAA procedures or rules would. Venue for any arbitration brought to enforce any term or condition of this Agreement will lie exclusively in New York.

JA-142 (emphasis added); *see also* JA-264. The Contract's broad arbitration provision makes arbitration the exclusive dispute resolution mechanism.

The Customer Disclosure Statement and the Terms and Conditions of the Contract further advised Mrs. Sudakow (in two places) of her right to rescind the agreement without penalty within three business days after receiving a forthcoming confirmation letter from the utility (Niagra Mohawk), and that she could cancel the agreement at any time with no cost. JA-138–139; JA-260–261. Mrs. Sudakow does not claim—and no evidence indicates—that she rescinded or cancelled the agreement. CleanChoice therefore initiated service in December 2021 and continued

supplying her electricity for another eight months—at the address to which it mailed her contract and the utility mailed her monthly bills—until she terminated the Contract in August 2022. JA-047; JA-117; JA-198.

### 2. Mr. Weinberg Enrolled in a Fixed-Rate Electricity Supply Contract with CleanChoice that Later Renewed on a Month-to-Month Basis at a Variable Rate.

In April 2017, Mr. Weinberg enrolled by telephone for one year of fixed-rate electricity from CleanChoice. JA-002; JA-103; JA-117. During his initial enrollment call, a CleanChoice representative explained to Mr. Weinberg that a written contract would follow in the mail. JA-002; JA-205. CleanChoice promptly mailed Mr. Weinberg a welcome package—consistent with its standard practices and as it did with Mrs. Sudakow—which included his full contract with its associated terms and conditions. JA-103; JA-120–124; JA-205; JA-217; JA-221; JA-223–231. Mr. Weinberg's contract contained a mandatory arbitration provision identical to the one in Mrs. Sudakow's Contract.

Mr. Weinberg re-enrolled in fixed rate contracts in April 2018 and again in April 2019. JA-003; JA-103; JA-117; JA-205; JA-217–218. With each re-enrollment, CleanChoice mailed Mr. Weinberg welcome packages that included the full terms and conditions for those agreements—and each one included an identical arbitration provision. JA-003; JA-103–104; JA-117; JA-126–130; JA-132–136; JA-205; JA-217–218; JA-233–253.

### 3. A Class Action Suit Is Filed Against CleanChoice, with Mrs. Sudakow, Mr. Sudakow, and Mr. Weinberg as Representative Plaintiffs.

The Complaint alleges that Mrs. Sudakow and Mr. Weinberg both received CleanChoice marketing materials by mail that included the summary of proposed contractual terms and conditions, FAQ sheet, and enrollment authorization form. JA-046. With respect to Mrs. Sudakow, the Complaint alleges that the "marketing material and authorization form were addressed" to Mrs. Sudakow, and that she "permitted Mr. Sudakow to sign the authorization form in her name, which he then did." JA-045–46. The Complaint does not mention the welcome packages CleanChoice sent in response or the documents they contained. *See generally* JA-026–089. It relies solely on the superseded summary of proposed terms and conditions contained in the Direct Mailer.

### 4. CleanChoice Moves to Compel Arbitration.

CleanChoice moved to compel arbitration of the Sudakow and Weinberg claims arguing that the arbitration provisions unambiguously mandate that all disputes between the parties be resolved in arbitration, including the threshold issue of arbitrability. *See generally* JA-097–113. CleanChoice further contended that, even if the District Court were to analyze the issue of arbitrability, each of Mrs. Sudakow's and Mr. Weinberg's claims fall within the scope of the arbitration provisions because each claim arises from contractual agreements with CleanChoice

11

for the supply of electricity. JA-110–113. CleanChoice additionally argued that the strong federal policy favoring arbitration mandates enforcement of the arbitration provisions and emphasized that doubts regarding arbitrability generally should be resolved in favor of arbitration. JA-106–107.

Plaintiffs opposed CleanChoice's Motion, arguing that the proposed terms and conditions provided to them at the time of their respective enrollments are the only binding and enforceable agreements with CleanChoice and that those agreements do not contain arbitration provisions (hereinafter, the "Opposition"). *See generally* JA-144–173. Plaintiffs also argued they were not on notice of the contracts mailed as part of the welcome packages and that such contracts were not assented to or signed by Mrs. Sudakow or Mr. Weinberg. JA-156–171.

Plaintiffs supported the Opposition with only a declaration from Mr. Sudakow, purporting to speak on behalf of Mrs. Sudakow, that states "[w]e don't remember receiving a new contract from CleanChoice," and that "[w]e did not and do not agree to arbitrate our claims we have against CleanChoice." JA-176–177. Notably, neither Mrs. Sudakow nor Mr. Weinberg submitted a declaration in support of the Opposition, and Plaintiffs did not otherwise provide evidence or testimony speaking to whether they received the mailed contracts.

In its reply brief, CleanChoice explained how the Sudakow and Weinberg contracts and their arbitration provisions were valid and enforceable agreements

assented to by Mrs. Sudakow and Mr. Weinberg and that any disputes regarding the scope of the arbitration provisions were conceded by silence. *See generally* JA-199–214. CleanChoice established, *inter alia*, that Mrs. Sudakow presented no relevant evidence demonstrating that she did not receive the Contract containing the Arbitration Provision, nor did she attempt to rebut the fact that she was on inquiry notice of and agreed to the Arbitration Provision by continuing to receive electricity supply from CleanChoice for nine months. JA-209. Additionally, CleanChoice again explained that the terms of the Contract superseded the terms of the Direct Mailer, and thus any purported conflict in the dispute resolution terms is irrelevant. JA-210–211.

CleanChoice also attached a supplemental declaration confirming its parameters for the mailing of welcome and re-enrollment packages, and attached copies of the customer parameters for Mrs. Sudakow and Mr. Weinberg's respective enrollments and copies of the welcome packages. *See* JA-216–266. As outlined in this declaration, during any given day, CleanChoice provides its mailing vendor AMi with a data file containing information for customers who enrolled for electricity supply the previous day, including customer contact information, product codes, and other identifying information ("Customer Parameters"). JA-217. AMi uses the Customer Parameters to generate welcome packages from CleanChoice templates, and then prints and deposits the welcome packages with the United States

13

Postal Service for mailing on behalf of CleanChoice. JA-217. This declaration and the supporting documents confirm that on or about November 17, 2021, CleanChoice sent Customer Parameters to AMi instructing it to generate and print the Welcome Package for Mrs. Sudakow along with a copy of the Contract, which was then deposited with the United States Postal Service for mailing to Mrs. Sudakow at the residential address that she directed CleanChoice to enroll and use for account correspondence. JA-218; JA-255; JA-257–266.

Plaintiffs received leave to file a sur-reply. *See generally* JA-267–282. In it, Mrs. Sudakow and Mr. Weinberg further argued that CleanChoice did not demonstrate that their contracts contained in the welcome packages were mailed, and that Mrs. Sudakow and Mr. Weinberg did not receive notice of or asset to the terms and conditions of the contracts. JA-271–279.

### 5. The District Court Grants CleanChoice's Motion to Compel Arbitration as to Mr. Weinberg but Not as to Mrs. Sudakow.

The District Court issued its Order on July 17, 2024, granting CleanChoice's motion to compel arbitration with respect to the claims asserted by Mr. Weinberg, denying CleanChoice's motion to compel arbitration with respect to the claims asserted by Mrs. Sudakow, and granting in part and denying in part CleanChoice's motion to dismiss. *See generally* JA-001–25. In the latter ruling, the Court granted CleanChoice's motion to dismiss Mr. Sudakow's claims premised on third-party-beneficiary theories for lack of Article III standing. JA-016–18. Additionally, in

14

response to CleanChoice's arguments that Plaintiffs lacked Article III standing to pursue injunctive relief under their New York General Business Law § 349, § 349-d(3), and § 349-d(7) claims and Plaintiffs' indication that they would re-file their injunctive claims in New York state court, the District Court granted CleanChoice's motion to dismiss the requested injunctive relief on consent. JA-016–18.

But the District Court found that CleanChoice did not expressly notify Mrs. Sudakow that she would be mailed additional or superseding terms and conditions after enrolling for CleanChoice's electricity supply services, that CleanChoice did not specifically call attention to the presence of the Arbitration Provision in the Contract, and that Mrs. Sudakow's continued payments for electricity supplied by CleanChoice were too passive to constitute assent to the Arbitration Provision in the Contract. JA-013–16. It erred in doing so. CleanChoice was not required to prove that Mrs. Sudakow had actual notice of the Arbitration Provision. CleanChoice's proof that she was on inquiry notice and assented to the terms of the Arbitration Provision was sufficient.

CleanChoice timely filed a Notice of Appeal on July 24, 2024. JA-283–284.

## SUMMARY OF THE ARGUMENT

The District Court erred in denying CleanChoice's motion to compel arbitration with respect to Mrs. Sudakow's claims.

*First*, a valid and enforceable arbitration provision exists that contractually binds Mrs. Sudakow to arbitrate the present dispute with CleanChoice. The record establishes that CleanChoice mailed the Contract containing the Arbitration Provision to Mrs. Sudakow pursuant to its standard business practices. That is all the law requires to invoke the presumption of receipt and inquiry notice of the Contract's terms. Mrs. Sudakow failed to rebut this presumption. As a matter of law, her husband's bare affidavit denial of remembering the Contract cannot create a fact issue on notice, even if he could testify on his wife's behalf (and he cannot). At a minimum, then, Mrs. Sudakow had inquiry notice of the Arbitration Provision.

*Second*, Mrs. Sudakow also assented to the Arbitration Provision as a matter of law. On its first page, the Contract prominently stated that Mrs. Sudakow could rescind the Contract in full and without penalty at any time up to three business days after she received a mailed "switch" notification from her public utility company and could cancel it at any time after without a fee. The Contract repeated these rights on the second page. CleanChoice mailed the Contract to Mrs. Sudakow in a Welcome Package in mid-November at the address she enrolled, but her electricity supply service did not begin until weeks later, on December 8. The Welcome Package conspicuously stated on its envelope that the information inside was important, and the Contract made up two-thirds of the Welcome Package's contents. Mrs. Sudakow did not rescind or cancel the Contract. She thereafter received and

paid for electricity from CleanChoice under her variable, month-to-month service plan for nine months. These undisputed facts establish Mrs. Sudakow's implied consent to the Contract's terms.

*Finally*, because the Contract incorporates the AAA Rules, any objections about the arbitrability of Mrs. Sudakow's claims must be submitted to the arbitrator as a matter of law. The District Court found as much in reference to Mr. Weinberg's identical arbitration clause. The result should be the same for Mrs. Sudakow.

CleanChoice respectfully asks the Court to reverse the District Court's Order denying CleanChoice's Motion to Compel Arbitration of Mrs. Sudakow's claims and remand the case with instructions to grant the motion, order the parties to arbitrate as contractually agreed, and stay the district court proceedings until arbitration has concluded.

## STANDARD OF REVIEW AND ARBITRATION LAW

A district court's denial of a motion to compel arbitration is subject to de novo review. *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702 (2d Cir. 2023). "The determination of whether parties have contractually bound themselves to arbitrate is a legal conclusion also subject to *de novo* review," but "[t]he factual findings upon which that conclusion is based, however, are reviewed for clear error." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 72–73 (2d Cir. 2017) (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002)).

The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), reflects "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Further, a party to an arbitration agreement may seek an order compelling arbitration where a counterparty "fail[s], neglect[s], or refus[es] . . . to arbitrate." 9 U.S.C. § 4.

When presented with a motion to compel arbitration, a court must decide two gateway issues: (1) whether the parties entered into a valid agreement to arbitrate and, if so, (2) whether the issue of arbitrability has been delegated to the arbitrator or, if not, whether the scope of the arbitration agreement encompasses the asserted claims. *See Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015); *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). Thus, as a threshold issue, "a court must first decide whether the parties agreed to arbitrate" their disputes before an agreement to arbitration can be enforced. *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022).

"The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Id*. at 101–02. This "burden does not require the moving party to show that the agreement would be

enforceable—only that an agreement to arbitrate existed." *Id*. (citation omitted). "Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to 'show[] the agreement to be inapplicable or invalid.'" *Id.* at 102 (citation omitted). In determining whether an agreement to arbitrate is valid, courts "apply the principles of state law that govern the formation of ordinary contracts." *PaineWebber Inc. v Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996); *Zachman*, 49 F.4th at 101.

If a Court determines that an agreement to arbitrate exists, it must then turn to the second gateway issue and analyze whether the issue of arbitrability has been delegated to the arbitrator or, if not, whether the asserted claims fall within the scope of the arbitration agreement. *See Holick*, 802 F.3d at 394. To the extent issues of arbitrability have been contractually delegated to the arbitrator, questions regarding the scope of the arbitration agreement are within the province of and are to be resolved by the arbitrator. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68–69 (2019). Where, as here, an arbitration provision states that disputes will be decided under AAA rules, courts hold that the provision "clearly and unmistakably" delegates the issue of arbitrability to an arbitrator. *Mobile Real Estate, LLC v. NewPoint Media Grp.*, 460 F. Supp. 3d 457, 471–72 (S.D.N.Y. 2020) (collecting cases).

In light of the "strong federal policy favoring arbitration as an alternative means of dispute resolution . . . where . . . the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability." *Hartford Accident and Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) (citations omitted).

## ARGUMENT

CleanChoice carried its burden to establish that Mrs. Sudakow agreed to arbitrate the underlying dispute. The District Court held otherwise in large part because CleanChoice did not give Mrs. Sudakow advance notice that it would "mail[] additional or superseding terms and conditions," and it concluded that Mrs. Sudakow "did not expressly or impliedly assent to the new arbitration provision" in the Contract. *Weinberg*, 2024 WL 3446515, at *7–8; JA-014–16. In doing so, the District Court heavily relied on a factually dissimilar e-commerce case involving plaintiffs who were unaware that they had even contracted with the party seeking arbitration until long after they were sent an arbitration provision via email, *Schnabel v. Trilegiant Corp.*, 2011 WL 797505 (D. Conn. Feb. 24, 2011), *aff'd*, 697 F.3d 110 (2d Cir. 2012). *Schnabel* does not control this hard-copy contract case in which Mrs. Sudakow knowingly enrolled with CleanChoice and authorized it to use the address to which it mailed her Contract.

Applying principles from traditional contract cases (that the District Court did not address) to the facts here establishes that Mrs. Sudakow was provided with notice of the Arbitration Provision and that she impliedly consented to the Contract in the Welcome Package by failing to rescind or cancel it in the weeks before her electricity supply service started. Indeed, while passive automatic credit-card payments in *Schnabel* were insufficient to notify the plaintiffs there that they had contracts with the defendant, Mrs. Sudakow knowingly and affirmatively chose to enroll in CleanChoice's renewable-energy service—a decision that itself came with a three-day recission window—and each month she received bills stating that she was being charged for energy supply from CleanChoice at the same home address to which CleanChoice sent the Direct Mailer and AMi mailed the Welcome Package containing the Contract. She paid those bills each month for the next nine months.

The District Court's Order denying arbitration of Mrs. Sudakow's claims should be reversed.

### A. A Valid and Enforceable Arbitration Provision Exists and Contractually Binds Mrs. Sudakow to Arbitrate Disputes with CleanChoice.

The District Court's order compelling Mr. Weinberg to arbitration truncates the first part of the Court's analysis. Because the arbitration provision in his contract is identical to the one in Mrs. Sudakow's, no genuine dispute should exist as to whether the Arbitration Provision is valid and enforceable, or whether it delegates

21

threshold issues to arbitration. The only question is whether Mrs. Sudakow entered into the Contract that contained it. That question looks to "ordinary principles" of state contract law, *Ross v. Am. Express Co.*, 478 F.3d 96, 99 (2d Cir. 2007), and New York law applies here,[1] JA-142; JA-264. The ordinary principles of New York contract law show that Mrs. Sudakow did consent to the Contract.

### 1. The Record Establishes That CleanChoice Mailed the Contract Containing the Arbitration Provision to Mrs. Sudakow, and She Failed to Rebut the Presumption That She Received It.

Mrs. Sudakow argued, and the District Court found, that she did not enter the Contract containing the Arbitration Provision because "the Sudakows were never notified by [CleanChoice] that they would be mailed additional or superseding terms and conditions." *Weinberg*, 2024 WL 3446515, at *7; JA-014. The District Court also found salient that CleanChoice neither "call[ed] attention to the presence of the arbitration provision in the customer agreement" nor expressly reserved in the enrollment-form agreement "the unilateral right to modify the terms and conditions for any reason." *Weinberg*, 2024 WL 3446515, at *7; JA-015. The District Court thus concluded that CleanChoice failed to establish the existence of a valid

---

[1] New York contract law does not meaningfully differ from that of other states when it comes to the enforceability of arbitration agreements. *See, e.g.*, *Meyer*, 868 F.3d at 74 ("not[ing] that New York and California apply 'substantially similar rules'" (citation omitted)); *see also Schnabel*, 697 F.3d at 119 ("[B]oth Connecticut and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term.").

agreement to arbitrate for lack of notice. *Weinberg*, 2024 WL 3446515, at *7; JA-015.

But the law applied to the record establishes that Mrs. Sudakow had—at minimum—inquiry notice of the full contractual terms and conditions (including the Arbitration Provision) that were mailed to her in the Welcome Package. New York law, like that of most states, does not make actual notice a prerequisite to contract formation. The District Court essentially required actual notice by distinguishing between the effectiveness of Mrs. Sudakow's notice as compared to Mr. Weinberg's because he was expressly told his contract terms would be mailed to him. It erred in doing so.

Even if a party "does not have actual notice of certain contract terms, he is nevertheless bound by such terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). Among the ways to show inquiry notice, and relevant here, is New York law's mailbox-rule "presumption that a party has received documents when mailed to the party's address in accordance with regular office procedures." *Manigault v. Macy's East, LLC*, 318 F. App'x 6, 7 (2d Cir. 2009); *see also Specht*, 306 F.3d at 31 ("[R]eceipt of a physical document containing contract terms or notice thereof is frequently deemed, in the world of paper transactions, a sufficient circumstance to place the offeree on inquiry

notice of those terms."). To fall within the presumption's ambit, all a party needs to do is provide "'affidavits as to [its] regular office mailing procedures' show[ing] that mail [containing the relevant contract] was properly addressed and delivered to the U.S. Postal Service." *Valle v. ATM Nat'l., LLC*, 2015 WL 413449, at *5 (S.D.N.Y. Jan. 30, 2015) (quoting *Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993)).

That is precisely what CleanChoice did here. The broad language of the Arbitration Provision mandates that any related actions, complaints, or disputes are to be arbitrated under AAA rules: "You and CleanChoice Energy agree irrevocably and unconditionally to settle any actions, complaints or disputes relating to this contract or the transactions contemplated by this contract under the rules of the American Arbitration Association (AAA)." JA-142; JA-264. Such broad arbitration provisions are routinely interpreted by courts to impose mutual obligations to arbitrate. *See, e.g.*, *Meyer*, 868 F.3d at 71.

CleanChoice mailed the Welcome Package containing the Contract (and the Arbitration Provision) to Mrs. Sudakow after receiving her enrollment form[2]. JA-

---

[2] CleanChoice is not an outlier in sending customers contracts in post-enrollment welcome letters. It is a standard ESCO industry practice. *See, e.g.*, *Martinez v. Agway Energy Servs.*, 2022 WL 306437, at *2 (N.D.N.Y. Feb. 2, 2022) (noting that defendant ESCO mailed a "Customer Disclosure Statement" with its "Welcome Letter" (subsequent history omitted)); *Forte v. Direct Energy Servs.*, 2017 WL 3495861, at *4 & n.2 (N.D.N.Y. Aug. 14, 2017) (same; "Welcome Letter" included "attached Terms and Conditions" and "Disclosure Statement"); *see also*

117; JA-138–143; JA-218; JA-255; JA-257–266. It was addressed to "Joanne Sudakow" at the residential address she provided to CleanChoice for the mailing of policy-related correspondence, and it was in an envelope that visibly stated it contained "Important information regarding your new clean electricity subscription." JA-266. Included in the Welcome Package envelope was a copy of Mrs. Sudakow's variable-rate Contract with its full terms and conditions. JA-257–266. Unlike the untitled, single-page summary terms included with the enrollment agreement, JA-092, the Contract in the Welcome Package was conspicuously titled—in bold font—"New York Residential and Small Commercial Sales Agreement" and comprised six of the nine pages contained in the envelope. JA-257–266.

CleanChoice submitted unrebutted declaration testimony from an employee familiar with its parameters and procedures for mailing CleanChoice customer

---

*Marshall v. Verde Energy USA, Inc.*, 2020 WL 5905072, at *1–2 (D.N.J. Oct. 5, 2020) (same; "Terms of Service"); *Gorecki v. Clearview Elec., Inc.*, 338 F. Supp. 3d 470, 472 (W.D. Pa. 2018) (same; "Sales Agreement and Terms of Service"); *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 406–07 (E.D. Pa. 2016) (same; "Terms & Conditions"); *Basile v. Stream Energy Pa., LLC*, 2016 WL 4611443, at *1–2 (M.D. Pa. Sept. 6, 2016) (same; "Disclosure Statement"); *Mirkin v. Viridian Energy, Inc.*, 2016 WL 3661106, at *2–3 (D. Conn. July 5, 2016) (same; "Terms and Conditions"); *Amaya v. Spark Energy Gas, LLC*, 2016 WL 1410755, at *3 (N.D. Cal. Apr. 11, 2016) (same; "Residential and Small Commercial Customer Disclosure Statement and Terms of Service"); *Fritz v. N. Am. Power & Gas, LLC*, 2015 WL 13841606, at *1 (D. Conn. Oct. 29, 2015) (same; "Customer Terms of Service").

welcome packages through its vendor at AMi. JA-217–218. It also provided the data for Mrs. Sudakow's enrollment as it was transmitted to AMi and then used that data to reproduce the Welcome Package mailing that would have been sent to Mrs. Sudakow as part of its customary practices. JA-217–218; JA-255. Nothing in the record suggests that CleanChoice sent AMi incorrect information; that AMi failed to process that information; that AMi mailed the Welcome Package to an incorrect address; or that the mailing was returned as undeliverable. Accordingly, CleanChoice carried its burden to show that Mrs. Sudakow presumptively received the Contract and was on inquiry notice of its terms. *See, e.g.*, *Krohn v. Spectrum Gulf Coast, LLC*, 2019 WL 4572833, at *3 (N.D. Tex. Sept. 19, 2019) (company "need only show that it sent the [document containing an arbitration provision] in keeping with its regular procedures"); *Wright v. Greensky, Inc.*, 2021 WL 2414170, at *14–15 (S.D. Fla. June 14, 2021) (applying mailbox rule to receipt of arbitration agreement where declaration "describe[s] the specific procedures Defendants use for preparing and mailing . . . and points to supporting evidence that Plaintiff received other billing statements that were mailed to her").

The burden thus shifted to Mrs. Sudakow to rebut the presumption of notice, but the only evidence proffered was a bare denial that she remembered receiving it, which this and many other Courts have held is insufficient as a matter of law. *See, e.g.*, *FDIC v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 205 F.3d 66, 75 (2d Cir.

2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material fact."); *Greensky*, 2021 WL 2414170, at *15 (citing, *inter alia*, *Larsen v. Citibank FSB*, 871 F.3d 1295, 1308 (11th Cir. 2017)). What's more, the declaration denial was not even from Mrs. Sudakow but from her husband, who was not the addressee on the correspondence, is not in privity of contract with CleanChoice, and was held to have no standing. JA-176–177. Mrs. Sudakow herself did not deny remembering the Welcome Package, and neither Sudakow actually declared that it never arrived. And even if they had, the "mere denial of receipt" does not rebut CleanChoice's evidence of mailing and inquiry notice. *See, e.g.*, *Valle*, 2015 WL 413449, at *5 (citing *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985)); *see also Oppenheimer & Co. v. Neidhart*, 56 F.3d 352, 358 (2d Cir. 1995) ("[A] party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in support of this claim."); *Dzanoucakis v. Chase Manhattan Bank USA, N.A.*, 2009 WL 910691, at *8 (S.D.N.Y. Mar. 31, 2009) (compelling arbitration where the only evidence was a declaration indicating that the plaintiff never received the agreement containing the arbitration provision).

The District Court's other two reasons for finding insufficient notice are also incorrect. It is true that the district court in *Valle* found as helpful indicia of an intent to arbitrate—among many other factors—a one-page cover letter that mentioned an arbitration provision was part of the mailing's enclosed contract. *See* 2015 WL

413449, at *3–4. But neither *Valle* nor any other case announces a per se rule that requires explanatory cover letters to comply with threshold notice requirements. The inquiry remains focused on whether a reasonable person had at least inquiry notice of an arbitration provision.

No reasonable person in receipt of a Welcome Package like Mrs. Sudakow's could have avoided noticing the enclosed Contract, which was the bulk of the mailing and came in an envelope that announced its contents were "Important" to the service enrollment that Mrs. Sudakow had recently requested. *See Schafer v. Direct Energy Servs.*, 481 F. Supp. 3d 141, 151 (W.D.N.Y. 2020) (holding that "there [was] no concern that the disclosure pages are themselves 'buried' amongst other documents" where the relevant "documents consist[ed] of less than ten pages") *vacated and remanded on other grounds*, 845 F. App'x 81 (2d Cir. 2021). As the District Court necessarily acknowledged in ordering Mr. Weinberg to arbitration, moreover, the Arbitration Provision met any clarity and conspicuousness requirements. Under the circumstances, Mrs. Sudakow presumptively received, read, and understood the Contract and its Arbitration Provision. *See, e.g.*, *Yoshida*, 2022 WL 88505, at *3–4; *Howard v. Ferrellgas Partners, L.P.*, 92 F. Supp. 3d 1115, 1133–39 (D. Kan. 2015) (enforcing arbitration provision "Master Agreement" that was mailed to customer after executing an oral contract because, among other things, plaintiff continued to use defendant's gas-delivery service after opt-out opportunity;

rejecting *Schnabel*-based arguments, and distinguishing *Schnabel* as a case where the plaintiffs "were not fully aware that they had entered a contract with the defendant").

The District Court also erred to the extent it denied CleanChoice's motion to compel because the Contract did not expressly state that CleanChoice has the right to amend or modify its terms. Contractual parties always have the right to propose amendments; otherwise, parties could never modify any contracts that do not contain express amendment procedures. *See, e.g.*, *Ferrie v. DirectTV, LLC*, 2016 WL 183474, at *9 (D. Conn. Jan. 12, 2016) (rejecting argument that *Schnabel* creates a "strict proposition that the only way a party can be put on inquiry notice of later-delivered contractual terms . . . is if the opposing party explicitly indicates that such terms will be later-delivered"; compelling arbitration); *Ferrellgas Partners*, 92 F. Supp. 3d at 1137–38 (rejecting argument that, for later-mailed agreement with arbitration clause to be effective, defendant should "have advised plaintiff, during [the enrollment] telephone call, that additional terms and conditions would be forthcoming or, in the alternative, included the Master Agreement with delivery and/or with plaintiff's initial bill"); *Okeechobee Resorts, LLC v. EZ Cash Pawn, Inc.*, 145 So.3d 989, 992 (Fla. Ct. App. 2014) (explaining that, "[w]hen a written contract is silent on the question of modification," the contract can still "be modified through a 'subsequent agreement' *or* the 'parties' subsequent conduct'" (citation omitted)).

Businesses routinely amend consumer contracts using the same procedures that CleanChoice did here, and courts routinely uphold those amendments, especially where the amendments (as here) are proposed before service begins or when they become effective only after an opt-out period. *See, e.g.*, *James v. Comcast Corp.*, 2016 WL 4269898, at *2 (N.D. Cal. Aug. 15, 2016) (enforcing amended contract containing arbitration agreement that was included in monthly bill under the doctrine of "novation" over customer's "bare denial" of receipt because, *inter alia*, the amendment allowed plaintiff the opportunity to opt-out and "specifically state[d]" that it was meant to "'replace and supersede *any prior agreement*'" (quoting contract)); *Ferrie*, 2016 WL 183474, at *8 (finding significant that, even if the "Customer Agreement" was sent to plaintiff shortly after he "agreed, in principle, to receive [defendant's] service" during the enrollment process, he did not cancel before he began "to receive service and before [his] first billing cycle commenced").

The Contract here did both of those things. It prominently disclosed that Mrs. Sudakow could rescind her enrollment with no penalty until three days after a forthcoming service-change notification and could still cancel the contract without penalty at any time. It is undisputed, moreover, that Mrs. Sudakow's electricity service with CleanChoice did not begin until three weeks ***after*** the day the Welcome Package was mailed. *See Valle*, 2015 WL 413449, at *4 ("[T]he primary concern. . . in springing unexpected terms on the customer is alleviated here where plaintiffs had

ample opportunity to opt-out of the Arbitration Provision after receiving sufficient notice of the new terms."); *see also Ferrellgas Partners*, 92 F. Supp. 3d at 1137 ("Here, there is no dispute that plaintiff knew full well what he was purchasing and from whom he was purchasing it. Defendant did not bury the arbitration provision in a random email; rather, it included it in a document specifically mailed to plaintiff's documented mailing address.").

In finding that CleanChoice did not provide sufficient notice of the Contract's terms and conditions, the District Court primarily relied on *Schnabel*. That case also involved a dispute over a post-enrollment contract with an arbitration provision, but the similarities end there. As several courts have recognized, *Schnabel* arose in the e-commerce context and its fact-intensive analysis should be construed to only "stand[] for the proposition that courts must look at the facts specific to each case to determine whether a reasonable person in the plaintiff's position would have been— based, inter alia, on the parties' prior course of dealings, industry practices, and the conspicuousness of the additional terms—on inquiry notice of the additional terms." *Ferrie*, 2016 WL 183474, *9; *see also Klarna*, 85 F.4th at 703 (acknowledging that "an offeree's manifestation of assent to an offeror's terms looks different for consumer contracts formed online"); *Kasparov v. Ambit Texas, LLC*, 2016 WL 6779497, at *3 (E.D.N.Y. Nov. 16, 2016) (distinguishing *Schnabel* as a case about "contracts of adhesion between an online consumer and an internet company");

31

*Ferrellgas Partners*, 92 F. Supp. 2d at 1137–38 (unlike *Schnabel*, plaintiff had "clear" notice of cancellation right that appeared on first page of mailed service contract).

*Schnabel* is inapposite here. The *Schnabel* plaintiffs purchased items on two merchant websites (Priceline and Beckett). 697 F.3d at 114. At the conclusion of their online transactions, the websites showed the plaintiffs an enrollment form for a third-party (Trilegiant) and its "Great Fun" service. *Id.* Although Great Fun was unrelated to the products and services offered by Priceline and Beckett, at least one of the plaintiffs believed the enrollment form was a continuation of the transaction process with Beckett. *Id.* at 114 n.3. The form asked for the plaintiffs' personal information and indicated that an "Online Price Guide subscription" would be emailed to the plaintiffs upon enrollment. *Id.* at 114–15. It also stated that by enrolling in Great Fun, plaintiffs authorized Trilegiant to obtain their credit card information from the vendor with whom plaintiffs had just transacted, which would be charged a monthly fee until plaintiffs called to cancel the service. *Id.* at 116.

By clicking a "Yes" button, plaintiffs also acknowledged reading hyperlinked "Terms and Conditions." *Id.* Once enrolled, Trilegiant sent plaintiffs an email under the Great Fun name that contained "a written document entitled Great Fun Membership Terms and Conditions." *Id.* Both the emailed and hyperlinked terms and conditions contained an arbitration clause. *Id.* The plaintiffs denied ever

receiving the emails, never used any of Great Fun's services, and ultimately cancelled the service after a family member noticed the reoccurring charges on the plaintiffs' credit cards. *See id.* at 117.

The plaintiffs later sued Trilegiant when it refused to refund the monthly fees charged to the plaintiffs' credit cards, and Trilegiant moved to compel arbitration based on the provision included in the post-enrollment email. *See generally Schnabel*, 2011 WL 797505. The district court denied the motion. *Id*. at *6. It emphasized the lack of any prior communication between Trilegiant and the plaintiffs, as well as the omission of any language in the welcome email indicating terms and conditions were included or notifying plaintiffs that they had the opportunity to "reject" their enrollment in Great Fun. *See id.* at *4–5. The court focused on the plaintiffs' unawareness of having ever signed up for a third-party service at the conclusion of their Priceline and Beckett transactions, distinguishing the facts before it from contract cases (like Mrs. Sudakow's) where consumers knowingly "accepted a benefit under the contract *after* being informed of the proposed terms." *Id.* at *5. The court also chided Trilegiant for its "suspect" use of an enrollment form that markedly differed from standard "clickwrap contracts" that are "ubiquitous" in e-commerce. *Id.* at *5 n.8.

The Second Circuit affirmed.[3] *Schnabel*, 697 F.3d at 130. It largely reiterated the district court's reasoning but highlighted several key points in its more granular analysis. Among them, it acknowledged precedent holding "as a matter of law" that additional terms "delivered after [a contractual] relationship" is forged still apply so long as the receiving party had "inquiry notice" of the terms and the parties' "history of . . . dealings with one another" made it reasonable to expect terms to be sent. *Id.* at 124. The Court concluded that the facts fell outside of that precedent because the email was "unsolicited," *id.* at 123, such that "a reasonable person would not be expected to connect an email that the recipient may not actually see until long after enrolling in a service (if ever) with the contractual relationship he or she may have with the service provider," *id.* at 127. The email also "effectively obscured the details of the terms and conditions" because "nothing" about the email "appeared to be a contract" or otherwise "called . . . attention" to the terms. *Id.* (cleaned up). The Court also declined to find notice and assent from plaintiffs' history of "auto-debited" credit card payments because the enrollment process could be completed without the

---

[3] Trilegiant "might have created a substantial question" on contract formation had it not forfeited its argument that plaintiffs could have clicked the terms-and-conditions hyperlink on the enrollment form. *Schnabel*, 697 F.3d at 129–30. Trilegiant failed to raise the issue to the district court, and the Second Circuit declined to consider it even though objective record evidence established the hyperlink's availability on the enrollment-form webpage. *Id.*

plaintiffs ever "reenter[ing]" or affirmatively providing their credit card information to Trilegiant—it was automatically transferred from Priceline and Beckett to Trilegiant once plaintiffs clicked the button to enroll. *See id.* at 127–29.

Mrs. Sudakow's case contrasts starkly with *Schnabel*. She did not "unwittingly sign[] up" for CleanChoice's renewable energy service, *cf. Ferrie*, 2016 WL 183474, at *6, through a confusing process that made it highly likely that she would not "even fully appreciate that [she] had entered into a contract," *id.* at *9. Mrs. Sudakow (through her husband) affirmatively responded to a hardcopy mail solicitation they fully understood was from CleanChoice by "review[ing] the mailer's contents and thereafter decid[ing] to sign up for CleanChoice," JA-045–46, detaching the enrollment form, completing it by hand, signing it, and then mailing it to CleanChoice so that her household could receive an important service: electricity supply. And the form expressly authorized CleanChoice to "enroll [her] address." JA-094. Having done that, a "reasonable person in [Mrs. Sudakow's] position would have realized that documents that were important to [her] (e.g., [her] bill) would have been sent to [the indicated] address." *Ferrie*, 2016 WL 183474, at *10. CleanChoice sent the Welcome Package to that address, and Mrs. Sudakow presumably received it under the mailbox rule. *See id.* at *5–11; *Ferrellgas Partners*, 92 F. Supp. 3d at 1133–39.

Unlike the email in *Schnabel*, moreover, there could be no doubt that it contained an important document directly relevant to Mrs. Sudakow's relationship with CleanChoice. The Welcome Package envelope expressly stated it held "Important information regarding [her] new clean energy subscription." JA-266. The enclosed Contract was prominently titled "**New York Residential and Small Commercial Sales Agreement**," and it made up two-thirds of the Welcome Package's contents. JA-257–266. And unlike the *Schnabel* plaintiffs' entirely passive relationship to the Great Fun program, the relationship between consumers like Mrs. Sudakow and energy supply service providers like CleanChoice is necessarily an active one. Each month the utility bill was sent to her address. The record reflects that Mrs. Sudakow paid her bill monthly and that the account was actively monitored, with Mr. Sudakow calling CleanChoice with questions about a bill. JA-181–182; JA-198.

*     *     *     *     *

The record before the District Court established the rebuttable presumption that Mrs. Sudakow received and had inquiry notice of the full contractual terms and conditions of her electricity supply agreement mailed by CleanChoice—including the Arbitration Provision and the provision indicating that it was to supersede any prior statements made in connection with CleanChoice's supply of electricity. Mrs. Sudakow offered no competent evidence to the contrary. Accordingly, the District

36

Court erred in finding that Mrs. Sudakow lacked notice of the Contract and Arbitration Provision and by essentially applying an actual-notice standard.

### 2. Mrs. Sudakow Implicitly Assented to the Terms and Conditions of the Sudakow Contract, Including the Arbitration Provision.

The notice analysis above applies with equal force to the District Court's finding that Mrs. Sudakow did not assent to the Contract. The District Court reached that conclusion in a brief discussion that construes *Schnabel* to preclude arguments that "continued payments" can be evidence of consent and that holds the Contract too "temporally and spatially decoupled" from enrollment. *Weinberg*, 2024 WL 3446515, at *8; JA-015–16. The District Court also seemed to believe that CleanChoice could only amend the Contract to account for "a change in any law, rule, regulation, tariff, or regulatory structure," because the Contract expressly provided for modifications only in its "Regulatory Change" section, and the Arbitration Provision was not "the result of such a 'Regulatory Change.'" *Id.* at *7 n.1; JA-015.

These reasons do not support finding a lack of consent. The circumstances here again differ significantly from the passive-relationship scenario in *Schnabel*. Mrs. Sudakow's affirmative monthly payments in response to receiving a monthly bill (of a significant amount, according to her) at the home address she directed CleanChoice to enroll, with information about a company she knowingly contracted with for electricity supply service simply are not the same as the automatic, small

reoccurring charges to the Schnabels' credit cards from a company the Schnabels did **not** understand they had contracted with. *Cf. Ferrie*, 2016 WL 183474, at *5–11; *Ferrellgas Partners*, 92 F. Supp. 3d at 1137–39. And again, there is no legal rule that limits parties to amendments only of the types specifically enumerated in a contract. Cases abound in which courts sign-off on arbitration provisions added to existing contracts without any discussion of whether the existing contract has a clause providing for future amendments. *See, e.g.*, *Lacour v. Marshalls of CA, LLC*, 2021 WL 1700204, at *3–4 (N.D. Cal. Apr. 29, 2021) (employment context; enforcing arbitration provision after applying mailbox rule; plaintiff failed to opt-out and provided only "barebones declaration that he never received the Agreement").

Nor was CleanChoice required to obtain evidence of Mrs. Sudakow's express consent to the Contract. As the District Court correctly observed, New York law mandates that energy consumers expressly consent only to *material* contract amendments, *see* N.Y. Gen. Bus. Law § 349-d(6), and this Court's precedents hold that arbitration provisions *are not* material, *see Weinberg*, 2024 WL 3446515, at *7 ("'[A]rbitration agreements do not, as a matter of law, constitute material alterations to a contract.'" (quoting *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 101 (2d Cir. 2002))). CleanChoice appropriately relied on implied-consent principles in obtaining Mrs. Sudakow's agreement to the Contract and Arbitration

Provision. CleanChoice's proof of that implied consent is a sufficient basis for enforcing the Arbitration Provision.

It is also inaccurate to say that the Contract was "decoupled" from enrollment, when it was sent in prompt response to Mrs. Sudakow's enrollment and announced on its envelope that it contained important information about that enrollment. In addition, Mrs. Sudakow's renewable electricity supply service did not begin until three weeks after CleanChoice mailed the Contract, and that Contract allowed her to rescind or cancel the agreement without penalty. In other words, pursuant to standard industry practice, *see infra* n.2, it was sent in the weeks-long window between enrollment and service when a reasonable consumer would expect it—and when Mrs. Sudakow could take action in response to it if she objected.

Moreover, it would not matter even if the District Court's "decoupled" framing were correct. *Schnabel* itself recognizes that contracts can be amended with arbitration clauses in at least two circumstances, both of which fit here: (1) when a party "contend[s] that the arbitration clause became effective after [the receiving party] received the terms-and-conditions [document] and then assented to the offer by not cancelling their [service]," 697 F.3d at 121, and (2) when the "initial enrollment [in a service] may be seen . . . to be the formation of an agreement" with the arbitration clause viewed as a "proposed amendment[] to that existing contract"

that can be accepted by payments, use of the service, or the "failure to cancel the service in a timely manner," *id.* at 122.

Mrs. Sudakow implicitly assented to the full terms and conditions of the Contract under New York's objective-manifestation-of-intent approach to contract formation, which analyzes assent by focusing on outward expressions like words, acts, and conduct. *See PaineWebber Inc.*, 81 F.3d at 1199; *see also Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*, 361 N.E.2d 999, 1001 (N.Y. Ct. App. 1977). Mrs. Sudakow had at least inquiry notice of the Contract. The law thus presumes that, as a reasonable consumer, she read the Contract and understood its terms. But, having done so, Mrs. Sudakow did not rescind or cancel the Contract.

Case law amply supports viewing her failure to rescind and subsequent use of CleanChoice's service, and payment of her bills, from December 2021 to August 2022 as implied assent to the Contract, and thus the Arbitration Provision. *See, e.g.*, *Yoshida*, 2022 WL 88505, at *3–4; *Greensky*, 2021 WL 2414170, at *17–18; *Ferrie*; 2016 WL 183474, at *5–11; *Ferrellgas Partners*, 92 F. Supp. 3d at 1133–39; *see also Hartranft v. Encore Capital Grp.*, 543 F. Supp. 3d 893, 919–22 (S.D. Cal. 2021) (holding "valid and enforceable" arbitration agreement was formed under similar circumstances); *Maynez v. Walmart, Inc.*, 479 F. Supp. 3d 890, 897–98 (C.D. Cal. 2020) ("Whether or not Plaintiff actually saw, reviewed, or read the Terms of Use is

not relevant to the question of whether she agreed to them."; distinguishing *Schnabel* and enforcing arbitration clause).

The District Court therefore erred in concluding that Mrs. Sudakow did not impliedly assent to the Contract and its Arbitration Provision. The Arbitration Provision governs the parties' dispute, and the District Court has a nondiscretionary duty to order Mrs. Sudakow's claims to arbitration. *See, e.g.*, *Bassett v. Elec. Arts Inc.*, 2015 WL 1298644, at *3 (E.D.N.Y. Feb. 9, 2015) ("[T]he FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.").

## B.  Because the Contract Incorporates the AAA Rules, Any Further Objections to Arbitration Must be Submitted to the Arbitrator.

After establishing the "initial validity of the agreement to arbitrate," the only issue remaining is to decide "*who* should determine the issue of arbitrability." *See, e.g.*, *Mobile Real Estate*, 460 F. Supp. 3d at 469–72 (discussing applicable standards to analyzing arbitrability). If a contract "explicitly incorporate[s] rules that empower an arbitrator to decide issues of arbitrability," such as the AAA's Rules, "the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *see also Henry Schein*, 586 U.S. at 70 ("[A] court possesses

41

no power to decide the arbitrability issue" if faced with a valid delegation.). To that end, the Arbitration Provision here expressly provides:

> Both You and CleanChoice Energy agree **irrevocably and unconditionally to settle any actions, complaints or disputes relating to this contract** or the transactions contemplated by this contract **under the rules of the American Arbitration Association (AAA)**. . . .

JA-142; JA-264 (emphasis added).

The District Court did not proceed to the second step of the FAA analysis because it found that there was no contractual agreement to arbitrate. *See Weinberg*, 2024 WL 3446515, at *8; JA-014–016. Had it done so, it would have concluded that arbitrability has been contractually delegated to an arbitrator, as it did with Mr. Weinberg's claims. *See Weinberg*, 2024 WL 3446515, at *6; JA-012–13. The delegation analysis has two prerequisites: (1) the language of the delegation clause must be clear and unmistakable; and (2) the delegation must not be revocable under state contract defenses such as fraud, duress, or unconscionability. *See Rent-A-Center*, 561 U.S. at 68.

The Arbitration Provision easily meets this standard. Its broad language clearly and unmistakably reserves the decision of arbitrability for the arbitrator, thereby satisfying the first prerequisite. JA-142; JA-264. As to the second, the delegation clause is not subject to defenses that make it revokable. Although the Complaint alleges CleanChoice engaged in various forms of misrepresentation and

deception, it does not specifically plead that either the Contract or Arbitration Provision are unconscionable or were procured by fraud or duress. *See generally* JA-026–089. Tellingly, Plaintiffs have never raised such arguments: the words "fraud" and duress" did not appear at all in Plaintiffs' opposition and sur-reply, and "unconscionable" appeared just once, as a passing reference to the arbitrability standard in a footnote. JA-155.

Just as with Mr. Weinberg's claims, Mrs. Sudakow's claims arise ***entirely*** out of the Contract and transactions contemplated by the Contract, which broadly governs the sale, nature, and variable-rate pricing of Mrs. Sudakow's electricity supply. Mrs. Sudakow alleges that: (i) CleanChoice's variable rates were untethered from the terms of the Contract; (ii) CleanChoice violated the Contract by failing to conspicuously disclose that Mrs. Sudakow would be charged a variable rate; and (iii) CleanChoice misrepresented the nature and source of the electricity that would be provided under the Sudakow Contract. JA-045–065. Indeed, Mrs. Sudakow has never disputed that her claims fall within the Arbitration Provision's scope. *See generally* JA-144–173; JA-267–280. Thus, a court lacks jurisdiction to adjudicate arbitrability as to any of her claims. *See Henry Schein*, 586 U.S. at 68 ("Therefore, where the parties' agreement delegates the arbitrability question to an arbitrator, a court may not override the contract.").

## CONCLUSION

The District Court's Order denying CleanChoice's Motion to Compel Arbitration of Joanne Sudakow's claims should be reversed and the case remanded to the District Court with instructions to grant the motion, order the parties to arbitrate as contractually agreed, and stay the district court proceedings until arbitration has concluded.

Dated: November 6, 2024

MCDOWELL HETHERINGTON LLP

*/s/ Michael D. Matthews, Jr.*

Michael D. Matthews, Jr.
Diane S. Wizig
Justin R. Chapa

*Counsel for Defendant/Appellant*
*CleanChoice Energy, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.　　This brief complies with the word limits of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this document contains 10,440 words consisting of 10,423 words counted by the software used to prepare this brief, and an additional 17 words contained in PDF screenshots not counted by that software.

2.　　This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*By: /s/ Michael D. Matthews, Jr.*
Michael D. Matthews, Jr.
