# 24-1988-cv

## United States Court of Appeals

### *for the*

## Second Circuit

———————◆———————

ERIC WEINBERG, on behalf of themselves and all others similarly situated,
ROBERT SUDAKOW, on behalf of themselves and all others similarly situated,
JOANNE SUDAKOW, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees,*

— v. —

CLEANCHOICE ENERGY, INC.,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLEES

J. BURKETT MCINTURFF
WITTELS MCINTURFF PALIKOVIC
18 Half Mile Road
Armonk, New York 10504
(910) 476-7253
– and –
JESSICA HUNTER
DANIEL J. BRENNER
WITTELS MCINTURFF PALIKOVIC
305 Broadway, 7th Floor
New York, New York 10007
(914) 775-8862

D. GREGORY BLANKINSHIP
FINKELSTEIN, BLANKINSHIP, FREI-
   PEARSON & GARBER, LLP
One North Broadway, Suite 900
White Plains, New York 10601
(914) 298-3281

*Attorneys for Plaintiffs-Appellees*



COUNSEL PRESS  (800) 4-APPEAL • (335521)

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................1

ISSUE PRESENTED FOR REVIEW ...........................................................4

STATEMENT OF THE CASE ......................................................................4

   A.  Procedural History ............................................................................4

   B.  Statement Of Facts ............................................................................5

      1.  The Sudakow Contract ................................................................5

      2.  CleanChoice's Supply Of Electricity To The Sudakows ............7

      3.  CleanChoice's "Welcome Package" ...........................................7

SUMMARY OF THE ARGUMENT ..........................................................9

STANDARD OF REVIEW AND ARBITRATION LAW ......................10

ARGUMENT .............................................................................................12

I.     The District Court Correctly Found That CleanChoice
      Failed To Meet Its Burden To Show That Ms. Sudakow
      Was On Inquiry Notice Of The Arbitration Agreement. ...............12

   A.  The Sudakow Contract—The Only Binding Contract Between
      The Parties—Does Not Contain An Arbitration Agreement. .......14

   B.  Under *Schnabel*, Inconspicuously Sending
      A Different Set Of Contract Terms After The Parties
      Have Already Entered A Binding Contract Is Ineffectual. ...........20

      1.  The Parties' Prior Course Of Dealings
         Do Not Support A Finding That Ms. Sudakow
         Was On Inquiry Notice Of The Subsequent Terms. ..................22

      2.  Industry Practices Do Not Support A Finding
         That Ms. Sudakow Was On Inquiry Notice Of The Subsequent Terms. ..23

      3.  The Subsequent Terms Were Not
         Conspicuously Presented To Ms. Sudakow. ............................25

4. The Lack Of Applicable Modification Provisions In The Sudakow Contract Supports The District Court's Finding That Ms. Sudakow Was Not On Inquiry Notice Of The Subsequent Terms. ..........29

5. CleanChoice's Arguments That *Schnabel* Is Not Binding Lack Merit.................................................31

C. The Mailbox Rule Does Not Excuse CleanChoice's Burden To Show Ms. Sudakow Was On Inquiry Notice. .............................37

II. The District Court Correctly Found That CleanChoice Failed to Meet Its Burden to Show That Ms. Sudakow Assented To The Arbitration Agreement By Paying Her Electricity Bill. ...................40

III. There Are Two Alternative Reasons For Affirming Denial Of Defendant's Motion To Compel Arbitration.................................43

A. Ms. Sudakow Is Not Bound By The Arbitration Provision Because CleanChoice Did Not Provide Evidence Of Her Express Consent As Required By N.Y. Gen. Bus. L. § 349-d(6)......44

B. The Multiple Dispute Resolution Options In The Welcome Package Contract Render The Arbitration Provision Voluntary...................47

CONCLUSION .......................................................................................49

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Aceros Prefabricados v. TradeArbed,*
282 F.3d 92 (2d Cir. 2002) ................................................................ 45

*Amaya v. Spark Energy Gas, LLC,*
No. 15- 02326, 2016 WL 1410755 (N.D. Cal. Apr. 11, 2016) ......... 24

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011) ........................................................................ 44

*Basile v. Stream Energy Pa., LLC,*
No. 15-01518, 2016 WL 4611443 (M.D. Pa. Sept. 6, 2016) ........... 24

*Breathe LLC v. White Fox Ventures, Inc.,*
268 F. Supp. 3d 510 (S.D.N.Y. 2017) ............................................ 41

*Campbell v. Gen. Dynamics Gov't Sys. Corp.,*
407 F.3d 546 (1st Cir. 2005) ........................................................... 29

*Dallas Aero., Inc. v. CIS Air Corp.,*
352 F.3d 775 (2d Cir. 2003) ............................................................ 41

*Daniel v. Am. Bd. of Emergency Med.,*
428 F.3d 408 (2d Cir. 2005) ........................................................ 43-44

*Dzanoucakis v. Chase Manhattan Bank USA, N.A.,*
No. 06-5673, 2009 WL 910691 (S.D.N.Y. Mar. 31, 2009) .............. 39

*Eric Hu v. Whaleco, Inc.,*
No. 23-6962, 2024 WL 4481439 (E.D.N.Y. Oct. 1, 2024) .............. 21

*Eshaghpour v. Zepsa Indus., Inc.,*
174 A.D.3d 440 (N.Y. App. Div. 2019) .......................................... 20

*Glikin v. Major Energy Electric Services LLC,*
No. 21-3097, 2022 WL 17366626 (2d Cir. Dec. 2, 2022) ...... *passim*

*FDIC v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.,*
205 F.3d 66 (2d Cir. 1999) ............................................................. 40

*Ferrie v. DirecTV, LLC,*
No. 15-409, 2016 WL 183474 (D. Conn. Jan. 12, 2016) ......... *passim*

*FFS Data Corp. v The OLB Grp., Inc.*,
No. 15-409, 2023 WL 2664717 (N.Y. Sup. Ct. Mar. 28, 2023) ................. 47, 48

*Fisher v. Aetna Life Ins. Co.*,
32 F.4th 124 (2d Cir. 2022) ................................................................. 13

*Forte v. Direct Energy Servs.*,
No. 17-264, 2017 WL 3495861 (N.D.N.Y. Aug. 14, 2017) ............................ 24

*Fritz v. N. Am. Power & Gas, LLC*,
No. 14-634, 2015 WL 13841606 (D. Conn. Oct. 29, 2015) ............................ 24

*Gorecki v. Clearview Elec., Inc.*,
338 F. Supp. 3d 470 (W.D. Pa. 2018) ................................................. 24

*Howard v. Ferrellgas*,
92 F. Supp. 3d 1115 (D. Kan. 2015) ...................................... 27, 35, 36

*Kindred Nursing Centers Ltd. P'ship v. Clark*,
581 U.S. 246 (2017) ........................................................................ 44

*Lamda Sols. Corp. v. HSBC Bank USA, N.A.*,
574 F. Supp. 3d 205–14 (S.D.N.Y. 2021) ................................. *passim*

*Landau v. Viridian Energy PA LLC*,
223 F. Supp. 3d 401–07 (E.D. Pa. 2016) .......................................... 24

*Lipsett v. Popular Bank*,
No. 22-3193, 2024 WL 111247 (2d Cir. Jan. 10, 2024) ................................... 13

*Manigault v. Macy's East, LLC*,
318 F. App'x 6–8 (2d Cir. 2009) ...................................................... 39

*Marshall v. Verde Energy USA, Inc.*,
No. 18-1344, 2020 WL 5905072 (D.N.J. Oct. 5, 2020) .................................. 24

*Martinez v. Agway Energy Servs.*,
No. 18-00235, 2022 WL 306437 (N.D.N.Y. Feb. 2, 2022) ............................ 24

*Mirkin v. Viridian Energy, Inc.*,
No. 15-1057, 2016 WL 3661106 (D. Conn. July 5, 2016) .............................. 24

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) ............................................................ 10

*Okeechobee Resorts, LLC v. EZ Cash Pawn, Inc.*,
    145 So.3d 989 (Fla. Ct. App. 2014) ........................................................ 35, 37

*Oppenheimer & Co. v. Neidhart*,
    56 F.3d 352 (2d Cir. 1995) ...................................................................... 40

*PaineWebber Inc. v. Bybyk*,
    81 F.3d 1193 (2d Cir. 1996) .................................................................... 20

*Pepper v. Fluent Inc.*,
    No. 21-6581, 2023 WL 4561798 (S.D.N.Y. July 17, 2023) ........................ 11

*Powell v. Schriver*,
    175 F.3d 107 (2d Cir. 1999) .................................................................... 44

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) .................................................................... 31

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012) ............................................................. *passim*

*Sgouros v. TransUnion Corp.*,
    817 F3d 1029–36 (7th Cir. 2016) ............................................................ 48

*Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17 (2d Cir. 2002) .................................................................. 3, 38

*Starke v. Squaretrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019) ............................................................. *passim*

*Stonehill Cap. Mgmt., LLC v. Bank of the W.*,
    68 N.E.3d 683 (N.Y. 2016) ..................................................................... 43

*Valle v. ATM Nat., LLC*,
    No. 14-7993, 2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) ................. 26, 27, 40

*Wright v. Greensky, Inc.*,
    No. 20-62441, 2021 WL 2414170 (S.D. Fla. June 14, 2021) .................. 35, 36

## **Statutes**

N.Y. Gen. Bus. L. § 349-d .......................................................... 3, 44, 46

**<u>Other</u>**

*Restatement (Second) of Contracts* § 24 (1981) ............................................. 18, 42

Plaintiff Joanne Sudakow submits this brief in opposition to the appeal of Defendant CleanChoice Energy, Inc. ("CleanChoice" or "Defendant") from the Opinion and Order dated July 17, 2024 denying CleanChoice's motion to compel arbitration (the "Opinion and Order" is at Joint Appendix ("JA") 1–25).

## PRELIMINARY STATEMENT

The relevant facts on this appeal are largely uncontested. CleanChoice sent Plaintiff Sudakow a direct mailer offering to sell her electricity in exchange for money. That mailer contained a marketing insert, a complete set of "Terms and Conditions," and an authorization form. That form made clear that to accept CleanChoice's offer, including the Terms and Conditions, Ms. Sudakow need only sign the authorization form and return it to CleanChoice. Ms. Sudakow's husband, acting for his wife, did so, thereby consummating a contract (the "Sudakow Contract") between the parties:

JA-94.

Defendant cannot contest the validity or formation of the Sudakow Contract. It admitted in writing to the New York Attorney General that the mailer it sent to Ms. Sudakow inviting her to enroll (the "Sudakow Mailer") constituted an "offer." *See* JA-181–82. And CleanChoice's records show that Defendant received the Sudakows' acceptance of its offer in October 2021. JA-117 ¶ 10. Instead, Defendant tries to minimize its more than 2,400-word contract by calling it a "marketing disclosure" or simply a summary of contract terms. Appellant's Brief ("App. Br.") at 6. Not so. The Sudakow Contract, with its detailed Terms and Conditions, is a complete contract, and it was those terms that Ms. Sudakow accepted when she permitted her husband to sign the authorization form on her behalf.

There is no dispute that the Sudakow Contract does not contain an arbitration clause. Nonetheless, CleanChoice argues that Ms. Sudakow's claims are subject to arbitration because, after the parties consummated the Sudakow Contract, it mailed her a different set of terms that **did** contain an arbitration clause (the "Subsequent Terms"), and Ms. Sudakow did not then affirmatively rescind the parties' prior written agreement. But, as Judge Halpern correctly held, CleanChoice's argument is foreclosed by *Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012). Under *Schnabel*, sending new contract terms to a party to a pre-existing contract only amends or supersedes those terms if the mailing "makes clear to a reasonable

2

consumer both that terms are being presented and that they can be adopted through the conduct that the offeror alleges constituted assent." *Id*. at 123 (cleaned up) (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002)).

The District Court properly applied *Schnabel*, holding that Ms. Sudakow had not entered into an agreement to arbitrate. *See* Opinion and Order at 13–16. Carefully analyzing the facts, Judge Halpern determined that Ms. Sudakow was not on inquiry notice of the Subsequent Terms and had not otherwise assented to them. *Id*. This factual determination may only be overturned if it was clearly erroneous, but the record amply supports affirmance even on *de novo* review.

Moreover, a New York statute expressly bars energy services companies ("ESCOs") like CleanChoice from unilaterally imposing material amendments to customers' contracts, precluding amendment based on inquiry notice or implied assent. *See* N.Y. Gen. Bus. L. § 349(d)(6) (requiring a customer's "express consent" for material changes to ESCO contracts). Finally, the Subsequent Terms do not in fact indicate that the parties agreed that Ms. Sudakow's claims could only be brought in an arbitration, thus providing an additional and independent basis for affirming the District Court.

While the District Court granted the motion to compel with respect to Plaintiff Weinberg (a decision he does not appeal), it properly denied the motion to compel arbitration with respect to Plaintiff Sudakow. That decision was not erroneous and

CleanChoice's appeal should be summarily denied.

## ISSUE PRESENTED FOR REVIEW

Did the District Court correctly find that Plaintiff Sudakow did not agree to arbitrate her claims? The answer is yes.

## STATEMENT OF THE CASE

### A. Procedural History

On November 2, 2023, Plaintiffs Eric Weinberg, Robert Sudakow, and Joanne Sudakow initiated this action by filing a class action complaint (the "Complaint") in the Southern District of New York. JA-26–94. On January 18, 2024, Defendant filed a motion to compel Plaintiffs to arbitrate their claims, JA-95–143, which Plaintiffs opposed, JA-144–198.[1] On July 17, 2024, Judge Halpern issued the Opinion and Order, granting the motion to compel arbitration as to Plaintiff Weinberg, *id.* at 8–13, and denying it as to Plaintiff Joanne Sudakow. *Id. at* 13–16. Seven days later, Defendant appealed the denial of its motion to compel Ms. Sudakow to arbitrate. JA-283.

---

[1] While the arbitration motion was pending, Defendant filed a Rule 12(b)(6) motion to dismiss, No. 23-9685, ECF No. 39, which Plaintiffs opposed. ECF No. 40. Judge Halpern resolved the dismissal motion in the same Opinion and Order as the arbitration motion, granting Defendant's motion to dismiss as to Mr. Sudakow's claims and Plaintiffs' claim for injunctive relief, *Id.* at 16–19, and otherwise denying the motion. *Id.* at 19–23. Judge Halpern's ruling on the dismissal motion is not part of this appeal. *See* JA-283.

**B.** <u>**Statement Of Facts**</u>

CleanChoice is an ESCO that has significantly overcharged tens of thousands of electricity customers in violation of both state consumer protection statutes and the common law. *See* JA-26–94 (Complaint). To entice customers to switch from their local utility, CleanChoice falsely promised that its variable electricity rates would be based on its procurement costs plus a reasonable margin, and that its electricity came "from renewable sources" and was "100% clean, pollution-free." In reality, CleanChoice sold the same "brown" energy as the local utility while adding an exorbitant mark up. JA-29–30, 48, 61–63.

**1.** **The Sudakow Contract**

In September 2021, Plaintiffs Joanne and Robert Sudakow received a CleanChoice mailer inviting them to enroll. *See* JA-91–94. The mailer contained two copies of a complete contract (the Sudakow Contract), an enrollment authorization form, and a FAQ page. *Id.* The Sudakow Contract spans more than 2,400-words and contains all elements of a contract, including "price," (fixed at $0.07/kH for the first month and variable thereafter), "term" (on-going, month-to-month, "until cancelled by one of the parties"), dispute resolution, and a host of other provisions. JA-91, 92.

The Sudakow Contract provides: "The Customer Disclosure Statement, Terms and Conditions and the enrollment authorization, constitutes an agreement between

CleanChoice Energy ('CleanChoice') and the undersigned customer ('Customer' or 'You') under which Customer shall initiate electricity service and begin enrollment with CleanChoice (the 'Agreement')." JA-91, 92. The Sudakow Contract unmistakably requires that "[v]enue for any lawsuit brought to enforce any term or condition of this Agreement will lie exclusively in NY." *Id.* The Sudakow Contract also contains an amendment provision pursuant under which CleanChoice may only unilaterally modify the contract to address "Regulatory Changes" (a defined term) that impact the contract, and then only with 30 days written notice. *Id.*

After reviewing the mailer, the Sudakows enrolled with CleanChoice by writing their utility account number on the authorization form as directed. *See* JA-94. The Sudakows then signed and dated the authorization form below a checkbox and statement that read in pertinent part, "I have reviewed and accept the enclosed terms and conditions and Bill of Rights. I authorize this enrollment by signing this form." *Id.*

The Sudakows submitted the completed and executed enrollment form to CleanChoice in October 2021. JA-176 ¶ 4 (Mr. Sudakow's Declaration). CleanChoice received the completed and executed authorization form in October 2021. JA-117 ¶ 10 (declaration from CleanChoice employee). Accordingly, as of October 2021, the Sudakows had entered into a binding contract with CleanChoice under the terms and conditions provided in the Sudakow Contract.

The Sudakow Contract does not contain an arbitration provision, and it does not incorporate any other documents by reference or express an intent to make any separate, future terms a part of the contract. *See* JA-91–94. Rather, the Sudakow Contract contains an integration provision providing that it "constitute[s] the entire Agreement between Customer and CleanChoice with regard to Customer's purchase of electric commodity and other related services from CleanChoice. This Agreement supersedes all prior agreements between the Parties, either written or oral." JA-91, 92.

### 2. CleanChoice's Supply Of Electricity To The Sudakows

According to CleanChoice's records, the Sudakow Contract became effective on November 9, 2021. *See* JA-255; *see also* JA-257 (Welcome Package noting "Signup Date: 11/9/2021"). Thereafter, CleanChoice began supplying electricity to the Sudakows' residence pursuant to the Sudakow Contract in December 2021. JA-47. On July 11, 2022, the Sudakows terminated their contract with CleanChoice. JA-181. CleanChoice stopped supplying electricity to the Sudakows' residence on August 10, 2022. *Id.*

### 3. CleanChoice's "Welcome Package"

CleanChoice claims that on or about November 17, 2021—over a week after the effective date of the Sudakow Contract, according to CleanChoice's records (JA-255, 257), and at least three weeks after CleanChoice received Ms. Sudakow's

7

authorization form (JA-117 ¶ 10)—it mailed a "Welcome Package" to Ms. Sudakow containing a two-page cover letter, a five-page unsigned form contract (the Subsequent Terms), and a single page "ESCO Consumers Bill of Rights" (collectively, the "Welcome Package"). *See* JA-218 ¶¶ 14–15; JA-256–66.

In its Memorandum in Support of the Motion to Compel Arbitration below, CleanChoice claimed the terms and conditions purportedly mailed in the Welcome Package is the "variable-rate contract with . . . the full terms and conditions of Ms. Sudakow's agreement with CleanChoice." JA-104; *see also* JA-117 ¶ 11; App. Br. at 7 (claiming same). CleanChoice produced the balance of the alleged contents of the Welcome Package for the first time almost two months later, on February 29, 2024, as an exhibit to its Reply in Support of the Motion to Compel Arbitration. *See* JA-256–66.

The Welcome Package was purportedly sent in a nondescript envelope with no sender identified, displaying only a return address and the following: "Important information regarding your new clean electricity subscription." JA-266. The cover letter welcomed Ms. Sudakow to CleanChoice and purported to provide data about the positive environmental impact of the "clean energy" supplied by CleanChoice. JA-257–58. The letter also stated: "Please note. National Grid may send you a letter in the near future confirming your switch to clean energy." JA-257. The letter provided no reference to or explanation of the enclosed form contract. It did not

disclose the contract's arbitration clause or any of the other differences from the Sudakow Contract's terms, or that the enclosed fine print was different at all.

The Subsequent Terms are not addressed to the Sudakows and do not bear their account number. JA-260–64. They also do not reference the Sudakow Contract or contain language suggesting that it is a proposed amendment to that pre-existing contract. The Subsequent Terms provide: "You acknowledge that by ***signing this Agreement***, You agree to initiate electricity supply service and to begin enrollment with CleanChoice Energy." JA-260 (emphasis added). The Subsequent Terms also refer to "the ***undersigned*** customer." *Id.* (emphasis added). CleanChoice has proffered no signature on the Subsequent Terms.

The Subsequent Terms differ from the Sudakow Contract in several material respects, including the pricing term and the addition of an arbitration agreement, buried at the end of the form under the innocuous heading "Choice of Laws." JA-264.

## <u>SUMMARY OF THE ARGUMENT</u>

Under *Schnabel*, CleanChoice's Subsequent Terms only superseded or amended the Sudakow Contract if: they conspicuously presented the proposed changes to the Sudakow Contract; they identified what actions Ms. Sudakow must take to assent to the new terms; and Ms. Sudakow took those actions. Because

9

none of those conditions occurred, the Subsequent Terms were not effective and there was no agreement to arbitrate Ms. Sudakow's claims.

## STANDARD OF REVIEW AND ARBITRATION LAW

A district court's denial of a motion to compel arbitration is subject to *de novo* review "where the denial is based on a legal conclusion about whether the parties contractually bound themselves to arbitrate." *Starke v. Squaretrade, Inc*., 913 F.3d 279, 288 (2d Cir. 2019) (affirming district court's order denying motion to compel arbitration). "[B]ut findings of fact, if any, bearing on this question are reviewed under a 'clearly erroneous' standard." *Schnabel*, 697 F.3d at 119 (affirming district court's order denying motion to compel arbitration).

When evaluating an arbitration motion, a court must first determine "whether the parties have indeed agreed to arbitrate[,]" which "is a question of state contract law." *Id.* at 118–19. The FAA "does not require parties to arbitrate when they have not agreed to do so." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (reversing dismissal based on arbitration agreement and quoting *Schnabel*, 697 F.3d at 118). "The touchstone of the inquiry under [New York] law is the parties' outward manifestations of assent." *Schnabel*, 697 F.3d at 119; *see also* App. Br. at 40 (discussing "New York's objective-manifestation-of-intent approach to contract formation, which analyzes assent by focusing on outward expressions like words, acts, and conduct").

"Courts deciding motions to compel arbitration apply a standard similar to that applicable for a motion for summary judgment." *Starke*, 913 F.3d at 281 n.1. "[T]he court considers all relevant, admissible evidence submitted by the parties and contained in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and draws all reasonable inferences in favor of the non-moving party[,]" here, Ms. Sudakow. *Id.*

As CleanChoice concedes, it bears the initial burden of demonstrating that an agreement to arbitrate was made. App. Br. at 18–19; *see also* Opinion and Order at 5 (same). "Under New York law," CleanChoice must therefore "prove by a preponderance of the evidence that all the elements necessary to form a valid contract are met, namely offer, acceptance, consideration, mutual assent, and intent to be bound." *Pepper v. Fluent Inc.*, No. 21 Civ. 6581, 2023 WL 4561798, at *7 (S.D.N.Y. July 17, 2023) (denying motion to compel arbitration; cleaned up). Likewise, CleanChoice concedes that the burden shifts to Ms. Sudakow to show the agreement's invalidity only if CleanChoice first demonstrates that there is a binding agreement. App. Br. at 19.

Whether or not the parties formed an agreement to arbitrate is a question solely for the court to decide. *See Schnabel*, 697 F.3d at 118 ("Inasmuch as the arbitrator has no authority of any kind with respect to a matter at issue absent an

agreement to arbitrate, the question of whether such an agreement exists and is effective is necessarily for the court and not the arbitrator.")

## ARGUMENT

CleanChoice makes two arguments as to why the Subsequent Terms (which it allegedly mailed to Ms. Sudakow after she had indisputably entered into a complete and binding contract) resulted in an agreement to arbitrate. First, CleanChoice argues that Ms. Sudakow was on inquiry notice of the arbitration agreement because it supposedly mailed her a new contract. App. Br. at 22–37. Second, CleanChoice argues that Ms. Sudakow impliedly consented to the arbitration agreement because she continued to pay her electricity bills after CleanChoice claims it mailed the new contract. *Id.* at 37–41. Both arguments lack merit.

## I. The District Court Correctly Found That CleanChoice Failed To Meet Its Burden To Show That Ms. Sudakow Was On Inquiry Notice Of The Arbitration Agreement.

The District Court correctly found that none of the circumstances surrounding Ms. Sudakow's enrollment with CleanChoice or the subsequent mailing of a "Welcome Package" would put a reasonable consumer on notice that CleanChoice sought to amend or supersede the binding Sudakow Contract with an arbitration agreement that was plainly inconsistent with the terms of the parties' existing contract. *See* Opinion and Order at 14–15 (quoting *Schnabel*, 697 F.3d at 126–27). Accordingly, the District Court concluded that Ms. Sudakow was not on inquiry

notice of the arbitration agreement and could not have been bound by it. *Id.*; *see also Lipsett v. Popular Bank*, No. 22-CV-3193, 2024 WL 111247, at *2–3 (2d Cir. Jan. 10, 2024) (affirming denial of motion to compel arbitration). Because the District Court's conclusion depended on its determinations of fact, the "clearly erroneous" standard applies. *Schnabel*, 697 F.3d at 119. *See also Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 136 (2d Cir. 2022) (stating that "[t]he district court (Woods, J.) found that Dunnegan was on inquiry notice of the terms of the February 19 Document . . . We review this factual finding for clear error" and affirming where the document that plaintiff claimed governed "repeatedly indicated that additional terms existed" and it was "obvious" to sophisticated law firm contractee that health insurance plan consisted of more than five pages)).

CleanChoice's contention that "[t]he District Court essentially required actual notice" demonstrates a fundamental misunderstanding of inquiry notice. App. Br. at 23.[2] As one of the decisions relied on throughout CleanChoice's brief explains: "Inquiry notice is actual notice of *circumstances* sufficient to put a prudent man upon inquiry." *Ferrie v. DirecTV, LLC*, No. 3:15-CV-409, 2016 WL 183474, at *7 (D. Conn. Jan. 12, 2016) (quoting *Schnabel*, 697 F.3d at 120). The District Court's

---

[2] *See also* App. Br. at 15 (claiming the District Court erred because it "was not required to prove that Ms. Sudakow had actual notice of the Arbitration Provision"); *id.* at 36–37 ("Accordingly, the District Court erred in finding that Ms. Sudakow lacked notice of the Contract and Arbitration Provision and by essentially applying an actual-notice standard.").

considerations of those circumstances were well-grounded, and they provided ample support for its finding that Ms. Sudakow was not on inquiry notice of the arbitration agreement. That finding was not erroneous.

**A.     The Sudakow Contract—The Only Binding Contract Between The Parties—Does Not Contain An Arbitration Agreement.**

As described below, the Sudakows' acceptance of the Sudakow Contract in October 2021 complied with the terms of CleanChoice's offer and was clear, unambiguous, and unequivocal. *See Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 213–14 (S.D.N.Y. 2021) ("In considering whether a binding contract exists, [t]he first step is to determine whether there is a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract." (cleaned up)). The Sudakow Contract is a binding agreement that does not contain an arbitration provision.

CleanChoice correctly concedes that a binding contract was formed when Ms. Sudakow returned the completed enrollment form. *See* JA-210–11 (arguing that the terms of the Sudakow Contract were "superseded" by the Subsequent Terms, which necessarily concedes that the Sudakow Contract's terms are binding). According to CleanChoice's records, the Sudakow Contract became effective on November 9, 2021. *See* JA-255.

The Sudakow Contract contains a "Customer Disclosure Statement" at the top, followed by two pages of identical "Terms and Conditions," which addresses typical contractual issues such as:

- "Length of Agreement"
- "Rescission and Effective Date"
- "Cancellation and Termination of Service"
- "Penalties, Fees and Exceptions"
- "Billing and Payment"
- "Consumer Protections"
- "Renewal"
- "Complaint/Dispute Procedures"
- "Dispute Resolution"
- "Limitations of Liability and Warranty/Force Majeure"
- "Disclosure of Customer Information"
- "Title, Risk of Loss and Indemnity"

JA-91, 92. The "Terms and Conditions" define (1) the Customer Disclosure Statement found at the top of the page, (2) the "Terms and Conditions" themselves, and (3) "the enrollment authorization" as a unitary "Agreement." *Id.* By the Sudakow Contract's own terms, it constitutes "the entire Agreement between [the Sudakows] and CleanChoice with regard to [their] purchase of electric commodity and other related services from CleanChoice." *Id.* The Sudakow Contract also includes a pricing term, CleanChoice's breach of which is one of the causes of action brought in the present litigation. JA-72–73. The Sudakow Contract only allows

15

CleanChoice's to modify the contract if it is impacted by "Regulatory Changes" (a defined term), and then only with 30 days written notice. JA-91; JA-92. CleanChoice correctly does not claim there were regulatory changes that justify modifying the Sudakow Contract.

The Sudakows thereafter enrolled by following the instructions provided. JA-94. The mailer advised that it was "easy" to become a CleanChoice customer and that "complet[ing] the attached form" and returning it to CleanChoice was "[a]ll that's required to switch[.]" *Id*. To complete the form, the Sudakows wrote in their utility account number as shown in the screenshot below ("**STEP #1: Account Number**") and signed and dated below a checkbox and statement reading in pertinent part: "I have reviewed and accept the enclosed terms and conditions and Bill of Rights. I authorize this enrollment by signing this form" ("**STEP #2: Authorization**"). *Id*.

This signed document, with the specifically-referenced Terms and Conditions, is a complete and binding contract. JA-91, 92 ("Subject to the terms and conditions of this Agreement, CleanChoice agrees to sell and deliver, and Customer agrees to purchase and accept the quantity of electricity necessary to meet Customer's requirements based upon consumption data obtained by CleanChoice from National Grid."). CleanChoice has already admitted just that. In a March 16, 2023 letter to the New York Attorney General's Bureau of Consumer Frauds and

16

Protection, Defendant's General Counsel admitted the Sudakows signed and returned this authorization form. JA-178, 181–82. Indeed, the General Counsel's letter refers to the contract included in the Sudakow Mailer as an "offer and contract details." JA-181 ("The direct mail marketing solicitation included the offer and contract details, an FAQ page, and a detachable letter of authorization.").

Nonetheless, Defendant now characterizes the signed Sudakow Contract as a mere "marketing disclosure summarizing the terms of the proposed agreement." App. Br. at 6. CleanChoice contends that "[a]s a result" of CleanChoice's receipt of the Sudakows' executed enrollment form, it then sent the Sudakows a "welcome package" that "included [their] variable-rate contract with its associated terms and conditions." *Id.* at 6–7. According to CleanChoice, this second, unsigned and generic form is somehow the parties' real contract, and as such, is the basis for Defendant's arbitration motion. *Id.*

There are at least three reasons why CleanChoice is wrong to claim that the signed Sudakow Contract was not a contract at all, but rather a mere "marketing disclosure."

First, the Sudakow Contract was clearly an "offer" capable of acceptance, as CleanChoice admitted to the New York Attorney General. *See Lamda*, 574 F. Supp. 3d at 213–14 ("In considering whether a binding contract exists, [t]he first step is to determine whether there is a sufficiently definite offer such that its unequivocal

17

acceptance will give rise to an enforceable contract.") (cleaned up).[3]  As detailed above, the Sudakow Contract contains a raft of contract terms, from basic (i.e., price, cancellation) to advanced topics (i.e., dispute resolution, customer information handling).  There is also clearly consideration: a mutual promise to exchange payment for electricity supply.

Second, there is no doubt the Sudakows accepted CleanChoice's offer.  "[I]n order for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous and unequivocal." *Lamda*, 574 F. Supp. 3d at 214.  Here, these requirements were met.  Following the authorization form's instructions— which are incorporated by reference into the "Agreement"—the Sudakows filled in their utility account number (**STEP #1**) and signed the "Authorization" (**STEP #2**).  JA-94.  They then returned the form to CleanChoice, as directed.  *Id.*  Thus, the Sudakows' acceptance "compl[ied] with the terms of offer" and was "clear, unambiguous and unequivocal." *Lamda*, 574 F. Supp. 3d at 214.  And if there was any question that following CleanChoice's instructions to sign and return the authorization was "clear, unambiguous and unequivocal" assent, CleanChoice's drafting and design of its enrollment form leaves no doubt: "by signing this form,"

---

[3] In New York (and elsewhere), it is black letter law that an "offer" is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Lamda*, 574 F. Supp. 3d at 214 (citing Restatement (Second) of Contracts § 24 (1981)).

the Sudakows expressly recorded their assent to a preprinted statement confirming that they "authorize[d] CleanChoice Energy to enroll" their account and "initiate service for 100% renewable energy" and that they had "reviewed and accept the enclosed terms and conditions." JA-94.[4]

Third, **nothing** in the Sudakow Mailer containing CleanChoice's offer indicates that the enclosed contract is simply a summary of some other, forthcoming and conflicting contract. In fact, the Sudakow Contract enclosed with the authorization form advised that it was the "entire Agreement." JA-91, 92. Nor did this "entire Agreement" advise that a different contract was on the way. Again, CleanChoice's mailer told the Sudakows **the exact opposite**, repeatedly advising that all they had to do was "complete the attached form and return it." JA-94 ("Simply sign and return this entire page."); *id*. ("All that's required to switch is your signature and current National Grid Account Number"); *id*. ("Return this entire page . . . to obtain your electricity . . . provided by CleanChoice[.]").

Considering this myriad of assurances, no reasonable person would expect that additional, conflicting terms were forthcoming. To the contrary, the Sudakow Contract makes no mention of future modification for anything other than defined

---

[4] Defendant also admits receipt of the signed enrollment form well within the deadline to enroll stated in the Sudakow Mailer. *See* JA-117 ¶ 10 (employee declaring CleanChoice received the signed authorization in October 2021); JA-94 (setting reply deadline of "11/30/2021").

changes in the governing regulatory regime (and only then upon 30 days written notice). *See* JA-91, 92. Nor does the Sudakow Mailer indicate that any terms—whether addressing arbitration or otherwise—had been withheld. Finally, far from providing a "summary" of forthcoming terms as Defendant oddly claims, the Sudakow Contract does not mention "arbitration" or even "alternative dispute resolution;" instead, it provides that "any lawsuit brought to enforce any term or condition of this Agreement" must be brought in New York. *Id.*

Moreover, CleanChoice makes no argument that the later-sent (and unsigned) Subsequent Terms were somehow incorporated by reference into the Sudakow Contract. "[A] party will not be bound to the terms of any document unless it is clearly identified in the agreement." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996). Here, the Sudakow Contract makes no reference to any additional terms, let alone in a manner that would meet New York's "exacting standard" for incorporation by reference, which requires that the "referenced material must be described in the contract such that it is identifiable beyond all reasonable doubt." *Eshaghpour v. Zepsa Indus., Inc.*, 174 A.D.3d 440, 441 (N.Y. App. Div. 2019).

**B.     Under *Schnabel*, Inconspicuously Sending
A Different Set Of Contract Terms After The Parties
<u>Have Already Entered A Binding Contract Is Ineffectual.</u>**

"An offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a

document whose contractual nature is not obvious." *Schnabel*, 697 F.3d at 123. CleanChoice does not contend that Ms. Sudakow had actual notice of the arbitration agreement in the Subsequent Terms. Thus, whether she agreed to arbitrate turns on whether she: (i) was on inquiry notice of the arbitration agreement, which depends on whether the terms were obvious, called to Ms. Sudakow's attention, and presented in a clear and conspicuous way; and (ii) assented to the arbitration agreement through conduct that a reasonable person would understand to constitute an unambiguous manifestation of assent. *See Starke*, 913 F.3d at 289, 292; *Schnabel*, 697 F.3d at 120. Thus, the "touchstone of the analysis is whether reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them." *Schnabel*, 697 F.3d at 124; *see also id.* at 120 ("[W]here the purported assent to a proposed amendment is largely passive, the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the term at issue."). Both inquiries—notice and assent—"are generally measured by an objective standard, and are clearly fact-intensive." *Eric Hu v. Whaleco, Inc.*, No. 23-CV-6962, 2024 WL 4481439, at *10 (E.D.N.Y. Oct. 1, 2024) (quotation omitted; cleaned up).

In *Schnabel*, this Court held that an unsolicited, post-enrollment communication purporting to amend an existing contract by adding an arbitration provision did not bind the consumer plaintiffs because: (i) the communication failed

to put the plaintiffs on inquiry notice of the arbitration provision; and (ii) the plaintiffs' continued payments under the contract did not constitute assent to the arbitration provision. *Schnabel*, 697 F.3d at 126–29. As the District Court here correctly concluded, Opinion and Order at 14, *Schnabel* is directly on point.

To determine whether an offeree was on inquiry notice, "courts must look at the facts specific to each case to determine whether a reasonable person in the plaintiff's position would have been—based, *inter alia*, on the parties' prior course of dealings, industry practices, and the conspicuousness of the additional terms—on inquiry notice of the additional terms." App. Br. at 31 (quoting *Ferrie*, 2016 WL 183474, at *9 (citing *Schnabel*, 697 F.3d at 126)).

### 1. The Parties' Prior Course Of Dealings Do Not Support A Finding That Ms. Sudakow Was On Inquiry Notice Of The Subsequent Terms.

As with the plaintiffs in *Schnabel*, Ms. Sudakow had no "prior course of dealings" with CleanChoice and, thus, no reason to anticipate that CleanChoice would send superseding contractual terms. *See* Opinion and Order at 14–15; *Schnabel*, 697 F.3d at 126; *see also Starke*, 913 F.3d at 296. Based on a review of the terms before entering the Sudakow Contract, Ms. Sudakow "would have reasonably believed that [her] contract did not contain an arbitration provision." *Starke*, 913 F.3d at 295.

CleanChoice argues that because the authorization form stated that by signing she would "enroll her address," and that she had an "active" relationship with CleanChoice, Ms. Sudakow should have known that CleanChoice would send her important documents. App. Br. at 35–36. But the prior course of conduct factor from *Schnabel* concerns whether a party would expect new and different terms to be offered in a particular manner, not whether they should expect to receive mail. Here, the Sudakow Contract indicated that no further terms were in the offing; nothing indicated that Ms. Sudakow should be on the lookout for a new contract sent in an inconspicuous envelope that did not even have CleanChoice's name on it.

### 2.  Industry Practices Do Not Support A Finding That Ms. Sudakow Was On Inquiry Notice Of The Subsequent Terms.

CleanChoice implies that it followed industry practice by sending the Subsequent Terms even though Plaintiff Sudakow had already agreed to another specific set of Terms and Conditions. App. Br. at 24 n.2. CleanChoice thus cites a number of other ESCO cases it contends demonstrate that mailing terms and conditions after enrollment is standard in the industry. App. Br. at 24 n.2. But none of those cases involve circumstances like the one at bar, where: the customer actually received a complete set of terms and conditions prior to enrollment and enrolled by checking a box and signing to confirm "accept[ance]" of "the enclosed terms and conditions," JA-94; the customer returned the signed form; and *then* the ESCO

attempted to modify those terms by subsequently sending different terms, despite no provision for such amendment or modification in the original terms.

Rather, these cases are akin to Mr. Weinberg's enrollment process, where the customer agreed to enroll without being presented with the full terms of the contract during that process, and then the ESCO subsequently sends the complete contract.[5] These cases demonstrate that it is *not* industry practice to engage in the kind of bait and switch scheme CleanChoice uses, where an ESCO sends customers a contract offer to which they are asked to agree only to gratuitously send them an entirely different contract. Indeed, if it were industry practice to merely send Subsequent Terms to supersede a previously signed contract, then those terms would not have themselves expressly required a second signature that CleanChoice did not obtain.

---

[5] *See Martinez v. Agway Energy Servs.*, No. 5:18-CV-00235, 2022 WL 306437, at *2 (N.D.N.Y. Feb. 2, 2022); *Forte v. Direct Energy Servs.*, No. 6:17-CV-264, 2017 WL 3495861, at *4 & n.2 (N.D.N.Y. Aug. 14, 2017); *Marshall v. Verde Energy USA, Inc.*, No. 18-CV-1344 (JBC), 2020 WL 5905072, at *1–2 (D.N.J. Oct. 5, 2020); *Gorecki v. Clearview Elec., Inc.*, 338 F. Supp. 3d 470, 472 (W.D. Pa. 2018); *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 406–07 (E.D. Pa. 2016); *Basile v. Stream Energy Pa., LLC*, No. 1:15-cv-01518, 2016 WL 4611443, at *1–2 (M.D. Pa. Sept. 6, 2016); *Mirkin v. Viridian Energy, Inc.*, No. 3:15-cv-1057 (SRU), 2016 WL 3661106, at *2–3 (D. Conn. July 5, 2016); *Amaya v. Spark Energy Gas, LLC*, Case No. 15-cv-02326-JSW, 2016 WL 1410755, at *3 (N.D. Cal. Apr. 11, 2016); *Fritz v. N. Am. Power & Gas, LLC*, No. 3:14-cv-634, 2015 WL 13841606, at *1 (D. Conn. Oct. 29, 2015).

### 3. The Subsequent Terms Were Not Conspicuously Presented To Ms. Sudakow.

CleanChoice could not have provided the Subsequent Terms in a *less* conspicuous manner.  CleanChoice did not give Ms. Sudakow any prior notice that she could expect new terms to be sent in the mail. To the contrary, it told her that all she needed to do to enroll with CleanChoice was to agree to the Terms and Conditions in the initial mailer, and those Terms and Conditions explicitly stated that CleanChoice could not amend the agreement absent specified regulatory changes. JA-91, 94.  The envelope CleanChoice used to send the Subsequent Terms did not identify that the sender was CleanChoice.  JA-266.  And if Ms. Sudakow opened the envelope (as opposed to treating it like the junk mail it appeared to be), she would have seen a cover letter that does not reference in any way the enclosed Subsequent Terms or that CleanChoice wished to amend or supersede the Sudakow Contract to which she had so recently—and expressly—agreed.  JA-257–58.  If Ms. Sudakow happened to look at the Subsequent Terms, she would have no reason to conclude that this fine print was different than the fine print in the Sudakow Contract to which she agreed, or that the Subsequent Terms were meant to have any legal force.  Indeed, nothing in the Subsequent Terms references the Sudakows, their account number, or the Sudakow Contract.  Nor does it alert the reader that CleanChoice intends to supersede an existing contract by, *inter alia*, inserting an arbitration agreement.  *See*

JA-260–64. And the arbitration clause is buried in small print at the end of Subsequent Terms under the innocuous header "Choice of Laws." JA-264.

No reasonable consumer in Ms. Sudakow's position would have known that CleanChoice was attempting to supersede a binding contract or understood "the conduct that would be required to assent to them." *Schnabel*, 697 F.3d at 124. As the District Court correctly observed, applying *Schnabel*, the Sudakows "were never notified by Defendant that they would be mailed additional or superseding terms and conditions." Opinion and Order at 14; *see also Schnabel*, 697 F.3d at 121 ("As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence." (quoting 1 Williston on Contracts § 4:16)).

Similarly, as in *Schnabel*, CleanChoice provided no communication that "highlighted that the Amended Agreement would supersede any previous agreement," nor did it "specifically point[] out the new Arbitration Provision." JA-14–15 (quoting *Valle v. ATM Nat., LLC*, No. 14-CV-7993, 2015 WL 413449, at *3 (S.D.N.Y. Jan. 30, 2015)); *Schnabel*, 697 F.3d at 123 n.14 ("But even had the email more clearly indicated that it contained an arbitration clause, the fact that it was delivered after enrollment and did not require any affirmative acknowledgment of receipt, undermines Trilegiant's assertion that the plaintiffs received sufficient notice to bind them to the additional terms through their inaction."). Nor did CleanChoice explain in the cover letter to the Welcome Package the method by

which "customers could reject the Arbitration Provision," as the District Court noted. Opinion and Order at 15 (quoting *Valle*, 2015 WL 413449, at *3).

CleanChoice complains that "neither *Valle* nor any other case announces a per se rule that requires explanatory cover letters to comply with threshold notice requirements." App. Br. at 38. Neither the District Court nor the *Valle* court contended there is such a per se rule, but the vast majority of decisions find similar information probative to this analysis—including the cases CleanChoice relies upon throughout its brief. *See, e.g.*, *Starke*, 913 F.3d at 289 ("In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention."); *id.* at 292 ("To determine whether Starke had reasonable notice of the arbitration provision, we must analyze whether the Post-Sale T&C were provided to Starke in a clear and conspicuous way."); *Ferrie*, 2016 WL 183474, at *7, *10 (discussing defendant's conspicuous disclosure of its arbitration provision and applying *Schnabel*); *Howard v. Ferrellgas*, 92 F. Supp. 3d 1115, 1138 (D. Kan. 2015) (finding defendant "provided plaintiff adequate notice" because it "highlighted the arbitration provision, as well as plaintiff's opportunity to opt-out of the agreement.").

The only fact CleanChoice points to in support its claim that it provided notice of the new terms in a conspicuous manner is the statement allegedly visible on the envelope of the Welcome Package that it contained "Important information

27

regarding your new clean energy subscription." JA-266. But because the envelope did not disclose that CleanChoice was the sender, a reasonable consumer would not expect a substantially modified set of terms from CleanChoice. If anything, a reasonable consumer would presume that the letter was the "confirmation letter from National Grid" referenced in the Sudakow Contract. JA-91, 92.

The District Court correctly found that the arbitration provision in the Subsequent Terms "'was both temporally and spatially decoupled from [the Sudakows'] enrollment' and as such, the Sudakows did not expressly or impliedly assent to the new arbitration provision of the customer agreement." Opinion and Order at 15 (quoting *Schnabel*, 697 F.3d at 127). CleanChoice claims that it is "inaccurate to say that the Contract was 'decoupled' from enrollment, when it was sent in prompt response to Ms. Sudakow's enrollment and announced on its envelope that it contained important information about that enrollment." App. Br. at 49. By CleanChoice's own admission, however, it sent the Welcome Package nearly three weeks after it received the executed Sudakow Contract in October 2021 (JA-117 ¶ 10), and more than a week after its own records state that it became effective. *See Id.*, JA-218, JA-255 (providing the Sudakow Contract was effective as of November 9, 2021).

In this context, "a reasonable person would not be expected to connect" a letter "with the contractual relationship he or she may have with the service provider,

especially where the enrollment required as little effort as it did for the [Sudakows] here." *Schnabel*, 697 F.3d at 127. A letter "regarding your new clean electricity subscription" would not have "'raise[d] a red flag vivid enough to cause a reasonable [person] to anticipate the imposition of a legally significant alteration to the terms and conditions' of the relationship with" CleanChoice. *Id.* (quoting *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 557 (1st Cir. 2005)). This further supports the District Court's conclusion that Ms. Sudakow did not have inquiry notice of the arbitration agreement and could not manifest assent to it. *See Starke*, 913 F.3d at 294 (disclosure of terms and conditions, including arbitration provision, that "was neither spatially nor temporally coupled with the transaction" supported conclusion that defendant didn't provide conspicuous notice of terms and plaintiff was not on sufficient notice to manifest assent).

The record amply supports Judge Halpern's factual finding that the Subsequent Terms were not presented in a conspicuous manner.

### 4. The Lack Of Applicable Modification Provisions In The Sudakow Contract Supports The District Court's Finding That Ms. Sudakow Was Not On Inquiry Notice Of The Subsequent Terms.

As in *Schnabel*, the controlling contract contained no applicable modification provisions, providing further support for the District Court's conclusion that Ms. Sudakow was not on inquiry notice of the arbitration agreement. *See* Opinion and Order at 15; *see also Schnabel*, 697 F.3d at 126 ("[T]he inclusion of such terms at

least helps to bolster the offeror's argument that the offeree is on inquiry notice of later arriving terms, particularly where the modification (or amendment) is itself submitted in such a manner that a reasonable offeree would be likely to see it.").

Further, per the parties' binding agreement, CleanChoice could only modify the Sudakow Contract if justified by certain regulatory changes, JA-91-92, and there were none. CleanChoice's limited contractual authority to modify the Sudakow Contract also required that it provide "30 days' written notice of such modification" to Ms. Sudakow. *Id*.

In *Glikin v. Major Energy Electric Services LLC*, this Court addressed a similar contractual provision in circumstances nearly identical to this case. No. 21-3097-cv, 2022 WL 17366626 (2d Cir. Dec. 2, 2022). There, the original contract between the plaintiff and the defendant ESCO required the ESCO to provide "30 days advance written notice of any material change to the Agreement." *Id*. at *2. As in this case, the ESCO sent a post-enrollment mailing with a cover letter and a four-page, fine-print document titled 'Maryland Residential and Small Commercial Disclosure Statement and Terms of Service,' which included an arbitration provision and class action waiver." *Id*. at *2–3. As in this case, "[t]he letter made no reference to those enclosed terms of service." *Id*. at *3. Applying Maryland law, this Court affirmed the district court's denial of the defendant's motion to stay the action pending arbitration, reasoning that because the ESCO's

letter "neither *informed* Glikin that the attached contract was modified nor *warned* her to review the contract for changes . . . . accepting Major's position would be the practical equivalent of writing the notice of any material change provision out of the customer agreement." *Id.* at *4 (emphasis in original, quotation and alteration omitted).

As in *Glikin*, allowing CleanChoice to unilaterally modify the Sudakow Contract despite its failure to provide the contractually required notice (or base such modification on "Regulatory Changes") "would be the practical equivalent of writing the" notice of modification provision out of the Sudakow Contract. *Id.*

### 5. CleanChoice's Arguments That *Schnabel* Is Not Binding Lack Merit.

CleanChoice argues that *Schnabel* has limited persuasive value because it "arose in the e-commerce context" and it shares no similarities with the instant case—other than that they both turned on "a dispute over a post-enrollment contract with an arbitration provision[.]" App. Br. at 41. CleanChoice is mistaken on both fronts.

First, the Second Circuit's analysis in *Schnabel* was grounded in traditional contract principles. *See Schnabel*, 697 F.3d at 124 ("While new commerce on the Internet [and elsewhere] has exposed courts to many new situations, it has not fundamentally changed the principles of contract." (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004))); *see also Starke*, 913 F.3d at 289

(applying "contract law principles" discussed in *Schnabel* "to online transactions"). Nor does CleanChoice explain how it matters that the plaintiff in *Schnabel* enrolled online and received the subsequent terms by email rather than regular mail. At least in *Schnabel*, the defendant indicated in the email "envelope" that it was from Trilegiant; CleanChoice's envelope does no such thing. *See* JA-266.

Second, the facts and applicable law in *Schnabel* are quite similar to this case. CleanChoice argues that *Schnabel* provides limited guidance because "its fact-intensive analysis should be construed to only 'stand[] for the proposition that courts must look at the facts specific to each case to determine whether a reasonable person in the plaintiff's position would have been—based, inter alia, on the parties' prior course of dealings, industry practices, and the conspicuousness of the additional terms—on inquiry notice of the additional terms.'" App. Br. at 31 (quoting *Ferrie*, 2016 WL 183474 at *9). Plaintiff Sudakow agrees that courts must undertake the analysis described in *Schnabel* in cases such as this one—and the District Court's conclusion that Ms. Sudakow was not bound by CleanChoice's arbitration provision was appropriately predicated on just such an analysis. Moreover, by conceding that issues of inquiry notice and assent are fact intensive, CleanChoice all but concedes the clearly erroneous standard of review applies.

CleanChoice also repeatedly misconstrues the District Court's reference to the absence of unilateral modification provisions as a misstatement of contract law,

complaining: "The District Court also erred to the extent it denied CleanChoice's motion to compel because the Contract did not expressly state that CleanChoice has the right to amend or modify its terms. Contractual parties always have the right to propose amendments; otherwise, parties could never modify any contracts that do not contain express amendment procedures." App. Br. at 29 (citing *Ferrie*, 2016 WL 183474, at *9); *see also id.* at 37, 38 (same).[6] In so arguing, CleanChoice ignores binding authority holding that a contracting party cannot be said to have agreed to a contract amendment absent sufficient notice that such an amendment is being proposed and a manifest acceptance of the proposed amendments. *See, e.g.*, *Starke*, 913 F.3d at 289, 292–94; *Schnabel*, 697 F.3d at 120–21, 128–29. None of the cases CleanChoice cites hold otherwise.

Rather, the court in *Ferrie* relied heavily on *Schnabel* in its adjudication of a motion to compel arbitration and undertook the same analysis discussed above. 2016 WL 183474, at *6–11. The *Ferrie* court's conclusion that the plaintiff had assented to the arbitration agreement was based on its determination that "[t]he *circumstances* of this case differ significantly from those present in the [*Schnabel*] case." 2016 WL 183474, at *7 (emphasis added). In contrast to the deficient

---

[6] CleanChoice's insistence that its position is consistent with "traditional contract principles" is belied by its belief that it can disregard the express terms of the modification provision in the Sudakow Contract. *See supra* Section I.B.4 (discussing *Glikin*, 2022 WL 17366626).

communications provided by CleanChoice and the *Schnabel* defendant, in *Ferrie* "[t]he undisputed evidence support[ed] the conclusion that a reasonable person in Ferrie's position would have known about the arbitration provision and what conduct would have constituted assent to provision." *Id.* at *39.

None of the *Ferrie* court's reasons for distinguishing *Schnabel* apply here. For example, the *Ferrie* court noted that "[o]ne of the most obvious differences between this case and [*Schnabel*] is that DIRECTV's arbitration provision was drastically more conspicuous than was Trilegiant's arbitration provision." As noted above, the arbitration clause in the Subsequent Terms could not have been more inconspicuous. *Id.* at *23. "Another notable difference between [*Ferrie*] and [*Schnabel*] is that DIRECTV's e-mails specifically tell the customer how he can reject the terms of the Customer Agreement, and what action will constitute acceptance." *Id.* at *24. CleanChoice's Welcome Package contains no such direction. "Yet another difference between [*Ferrie*] and [*Schnabel*] is that in this case, the arbitration provision was not as 'temporally and spatially decoupled from [Ferrie's] enrollment in and use of [DIRECTV]' as was the arbitration provision in [*Schnabel*]." *Id.* at *27. In *Ferrie*, the terms at issue were presented during the enrollment process, but, as Judge Halpern found, CleanChoice's Subsequent Terms were temporally and spatially decoupled from the enrollment process. And "unlike the customers in [*Schnabel*], who had no way of knowing about the additional terms

prior to entering into their initial agreement with Trilegiant, Ferrie could have readily acquainted himself with the terms and conditions of the Customer Agreement prior to initiating a contractual relationship with DIRECTV." *Id.* at *39. Ms. Sudakow had not been directed to the Subsequent Terms when she enrolled with CleanChoice and accepted the Sudakow Contract.

Indeed, the cases upon which CleanChoice relies do not even support its contention that "[c]ontractual parties always have the right to propose amendments; otherwise, parties could never modify any contracts that do not contain express amendment procedures." App. Br. at 29 (citing *Ferrie*, 2016 WL 183474, at *9; *Ferrellgas Partners*, 92 F. Supp. 3d at 1137–38; *Okeechobee Resorts, LLC v. EZ Cash Pawn, Inc.*, 145 So.3d 989, 992 (Fla. Ct. App. 2014)).

The dispute in *Ferrie* turned on whether the plaintiff was bound by a contract sent following enrollment by telephone—the opinion does not even mention a proposed amended contract. *See* 2016 WL 183474, at *2, 3–11; *see also Wright v. Greensky, Inc.*, No. 20-cv-62441, 2021 WL 2414170, at *1–2, 12–13 (S.D. Fla. June 14, 2021) (same). Indeed, *Ferrie* is significantly more like the circumstances of (non-Appellee) Plaintiff Weinberg's enrollment, addressed below by Judge Halpern. Plaintiff Weinberg enrolled in CleanChoice by telephone three separate times, and each time CleanChoice followed the phone call by mailing him a customer agreement containing an arbitration provision, Opinion and Order at 2–3, and

35

instructions on how to rescind the contract prior to it becoming effective. *Id. at* 12. Because Plaintiff Weinberg did not rescind his telephone enrollments, Judge Halpern found that CleanChoice had established that Plaintiff Weinberg agreed to arbitration (a decision which Plaintiff Weinberg does not appeal). *Compare id. with Ferrie*, 2016 WL 183474, at *11 ("[T]he court concludes that Ferrie was on inquiry notice of the arbitration provision and what steps he could take to reject the provision. Because Ferrie did not take the steps necessary to reject the arbitration provision, but rather took the steps that DIRECTV told him would constitute assent, the court concludes that Ferrie assented to the arbitration agreement.").

Similarly, in *Ferrellgas Partners*, the parties also began their relationship not with an executed written contract like Plaintiff Sudakow, but instead via oral agreement. Moreover, unlike the continuous provision of electricity supply contracted for here, the initial (oral) agreement in *Ferrellgas Partners* covered only single transaction, 92 F. Supp. 3d at 1129, which was then followed by a written contract that governed all ***future*** transactions. *Id.* at 1133, 1137–38. The *Ferrellgas Partners* court expressly found that the written contract constituted a "new offer," *not* an amendment to the parties' previous oral agreement. *Id.* at 1128–29, 1133.

Likewise, *Okeechobee Resorts* did not address whether a party could amend a contract that did "not contain express amendment procedures." App. Br. at 29. As in this case, the contract at issue *did* contain terms addressing amendment

procedures. *See Okeechobee Resorts*, 145 So.3d at 991; JA-91, 92. Because those terms foreclosed the oral modification of a written contract asserted by the appellant, the court held that under Florida law, the "trial court was obligated to enforce the contract as plainly written[,]" and affirmed the decision granting summary judgment against the appellant. *Id.* at 996.

## C. The Mailbox Rule Does Not Excuse CleanChoice's Burden To Show Ms. Sudakow Was On Inquiry Notice.

CleanChoice argues that establishing a rebuttable presumption that the Welcome Package was *delivered* to Ms. Sudakow is sufficient to demonstrate that she "had inquiry notice of *the full contractual terms and conditions* of her electricity supply agreement mailed by CleanChoice—*including the Arbitration Provision* and the provision indicating that it was to supersede any prior statements made in connection with CleanChoice's supply of electricity." App. Br. at 36 (emphasis added); *see also id.* at 16, 26–27. Essentially, CleanChoice seeks an end-run around the notice and assent analysis.

"But cases applying the duty-to-read principle still require that the offeree be put on notice of the existence of additional contract terms before it can be said that he has assented to them." *Starke*, 913 F.3d at 295; *see also Schnabel*, 697 F.3d at 124 ("[C]ases applying the 'duty to read' principle to terms delivered after a contracting relationship has been initiated do not nullify the requirement that a consumer be on notice of the existence of a term before he or she can be legally held

to have assented to it."). Thus, although a person can be bound by terms he has not read, "the 'offer [must nonetheless] make clear to [a reasonable] consumer' both that terms are being presented and that they can be adopted through the conduct that the offeror alleges constituted assent." *Schnabel*, 697 F.3d at 123 (quoting *Specht*, 306 F.3d at 29).

Furthermore, courts are disinclined to find the "duty to read" sufficient for inquiry notice in situations such as this, where "there is no policy rationale supporting [CleanChoice]'s approach inasmuch as there are a plethora of other ways . . . through which [CleanChoice] could have met the minimum requirements of notice." *Schnabel*, 697 F.3d at 128. There is no justification for CleanChoice's attempts to unilaterally alter the terms of its customer contracts—particularly so quickly after enrollment. *See Starke*, 913 F.3d at 295 ("But we find little justification for [providing contract terms after a transaction] here, where it would have been virtually costless for SquareTrade to provide the governing terms and conditions to Starke before he bought the Protection Plan."). CleanChoice cannot solicit Ms. Sudakow's business under the terms of one contract, only to then frustrate Ms. Sudakow's objective (contracting for services under the terms of the signed Sudakow Contract) by inconspicuously sending her different contract terms less than a month later. This is the definition of a bait and switch.

Notably, the date stamp on the unsigned Subsequent Terms ("7/28/2021 8:32 PM", JA-138–42), suggests it was drafted in July 2021. It is simply unreasonable for CleanChoice to (1) draft the contract it wishes to use in July 2021, *id*.; (2) nonetheless offer the consumer a different version (without an arbitration clause) in September 2021, JA-117 ¶ 10; (3) specify that the version offered can be accepted through November 2021, JA-94; and then (4) immediately attempt to swap the customer's contract with the version it preferred all along.

Thus, even if CleanChoice could rely on mailing records to establish a rebuttable presumption that the Welcome Package was delivered to Ms. Sudakow, it would still fail to demonstrate that she had notice of or assented to the arbitration agreement.

The cases CleanChoice relies on in support of its position are unavailing because they concern adequate notice and manifestations of assent not present in this case. *See, e.g.*, *Manigault v. Macy's East, LLC*, 318 F. App'x 6, 7–8 (2d Cir. 2009) (notice provided by mailing with clear "opt-out form"; assent manifested through continued employment); *Dzanoucakis v. Chase Manhattan Bank USA, N.A.*, 2009 WL 910691, at *8 (S.D.N.Y. Mar. 31, 2009) (notice provided "in compliance with the [original] agreement's [modification] terms adding an arbitration provision to the contract and giving plaintiff an opportunity to object"). Indeed, the District Court distinguished *Valle* on these grounds, observing that CleanChoice provided no

communication that "highlighted that the Amended Agreement would supersede any previous agreement," nor did it "specifically point[] out the new Arbitration Provision."  Opinion and Order at 21 (quoting *Valle*, 2015 WL 413449, at *3).

CleanChoice's reliance on *Oppenheimer & Co. v. Neidhart*, 56 F.3d 352, 358 (2d Cir. 1995), and *FDIC v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 205 F.3d 66, 75 (2d Cir. 1999), App. Br. at 26–27, is particularly misplaced.  *Oppenheimer* concerned whether the plaintiffs were "customers" of the defendant under the National Association of Securities Dealers Arbitration Code, *not* whether a mailing was sufficient to bind the plaintiffs to an amendment to an existing contract.  *See* 56 F.3d at 356–57.  *FDIC* concerned whether the plaintiff presented sufficient evidence to demonstrate it was entitled to indemnification under the terms of a bond; it did *not* discuss amendments to contracts, arbitration, or the mailbox rule.  *See* 205 F.3d at 70–71.

## II. The District Court Correctly Found That CleanChoice Failed to Meet Its Burden to Show That Ms. Sudakow Assented To The Arbitration Agreement By Paying Her Electricity Bill.

The District Court correctly concluded that just because Ms. Sudakow received and paid "for continuous electricity service from CleanChoice for about a year" did not demonstrate assent because such "actions" were "too passive for any reasonable fact-finder to conclude that they manifested a subjective understanding

40

of the existence of the arbitration and other emailed provisions and an intent to be bound by them."  Opinion and Order at 15 (quoting *Schnabel*, 697 F.3d at 128).

CleanChoice argues that, by paying her bills as they came due, Ms. Sudakow consented to contractual amendments of which she was unaware.  App. Br. at 37.  As an initial matter, it is worth noting that such conduct is equally consistent with the terms of the signed Sudakow Contract, a reality CleanChoice ignores.  Indeed, CleanChoice points to nothing suggesting that Ms. Sudakow's conduct or the parties' course of dealing can be specifically linked to the unsigned forms on which CleanChoice's appeal relies, rather than the Sudakow Contract.

To demonstrate that its Subsequent Terms unseated the signed Sudakow Contract, CleanChoice must prove mutual assent to a new contract.  *Breathe LLC v. White Fox Ventures, Inc.*, 268 F. Supp. 3d 510, 514 (S.D.N.Y. 2017) (citing *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003)).  CleanChoice claims such assent was manifested by "monthly payments in response to receiving a monthly bill[.]"  App. Br. at 37.  But CleanChoice provided no notice that paying Ms. Sudakow's bills would constitute notice of "the conduct that the offeror alleges constituted assent."  *Schnabel*, 697 F.3d at 123.  The absence of any notice that simply paying her electric bills would have resulted in acceptance of the Subsequent Terms is itself fatal to Defendant's appeal.

If anything, the Subsequent Terms make clear that assent is manifested only by actually signing those terms. The Subsequent Terms provide: "You acknowledge that by **signing this Agreement**, You agree to initiate electricity supply service and to begin enrollment with CleanChoice Energy." *Id.* (emphasis added). The Subsequent Terms also refer to "the **undersigned** customer." JA-260 (emphasis added). CleanChoice has proffered no signature on the Subsequent Terms. No reasonable person would understand she would be bound **even if she never signed**.

Instead, CleanChoice asks the Court to infer assent from entirely passive conduct: Ms. Sudakow failing to cancel her CleanChoice service after alleged receipt of the Subsequent Terms. App.Br. at 8–9. While New York law sometimes allows assent to be manifested through silence or inaction (although not in the case of amended ESCO contracts), such conduct is not an effective manifestation of assent unless the offeree "intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Schnabel*, 697 F.3d at 120 (citing Restatement (Second) of Contracts § 19(2)). Here, **nothing** put Ms. Sudakow on notice that CleanChoice's new form contract could be adopted through such inaction. The opposite is true—the form refers to "the undersigned customer" and solicits acknowledgment "**by signing**," JA-260 (emphasis added), indicating that only a signature constitutes assent.

Further, when assessing objective manifestations of intent, the focus is on "the totality" of "the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 68 N.E.3d 683, 689 (N.Y. 2016). In these circumstances, no "reasonable person would understand" the Ms. Sudakow'' inaction "to constitute assent." *Schnabel*, 697 F.3d at 120.

A review of "the situation of the parties, and the[ir] objectives," *Stonehill Cap. Mgmt.*, 68 N.E.3d at 689, also confirms that Ms. Sudakow did not agree to a new contract. Ms. Sudakow and her husband are residential consumers who dutifully followed CleanChoice's prior instructions for switching—that is, consumers who did "all that [was required] to switch." JA-94. Meanwhile CleanChoice is a large, sophisticated commercial actor, clearly capable of providing adequate notice.

The record amply supports Judge Halpern's conclusion that Ms. Sudakow did not manifest her intent to agree to the arbitration clause buried in the Subsequent Terms.

## III. There Are Two Alternative Reasons For Affirming Denial Of Defendant's Motion To Compel Arbitration.

This Court can affirm the denial of Defendant's motion to compel arbitration on two alternative grounds. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 421 (2d Cir. 2005) ("Our court may, of course, affirm the district court's judgment on any ground appearing in the record, even if the ground is different from the one

relied on by the district court."); *Powell v. Schriver*, 175 F.3d 107, 113 (2d Cir. 1999) (concluding that, without cross-appeal, defendant may raise as alternative ground for affirmance argument rejected by district court).  Underlined First, N.Y.  Gen. Bus. L. § 349-d(6) precludes material amendments to ESCO contracts with consumers absent their express affirmation of the amendments, precluding a finding that Plaintiff Sudakow was on inquiry notice or impliedly asserted to the amendments.  Second, the Subsequent Terms do not require that Ms. Sudakow must bring her claims in arbitration as opposed to a New York court.

### A.  Ms. Sudakow Is Not Bound By The Arbitration Provision Because CleanChoice Did Not Provide Evidence Of Her Express Consent As Required By N.Y. Gen. Bus. L. § 349-d(6).

N.Y. Gen. Bus. L. § 349-d(6) requires ESCOs to obtain a customer's express assent to material contract modifications: "No material change shall be made in the terms or duration of any contract for the provision of energy services by an ESCO without the express consent of the customer."  There is no dispute that Ms. Sudakow did not provide express consent to the Subsequent Terms; accordingly, if N.Y.  Gen. Bus. L. § 349-d(6) applies, CleanChoice's contention that the arbitration agreement is binding based on inquiry notice and implied assent is foreclosed as a matter of New York law.[7]

---

[7] Because N.Y. G.B.L. § 349-d does not target arbitration specifically but rather generally applies to all provisions in contracts between ESCOs and their customers,

The District Court concluded that inclusion of an arbitration agreement is not a material change. Opinion and Order at 13–14 (citing *Aceros Prefabricados v. TradeArbed*, 282 F.3d 92 (2d Cir. 2002)). However, in *Aceros*, this Court only held that adding an arbitration clause is not **always** a material change; rather, its materiality is determined "on a case-by-case basis." *Id.* at 100. Moreover, *Aceros* addressed specific standards of materiality where both parties are "merchants for the purposes of the UCC[,]" which is not at issue here. *Id.* at 99.

*Glikin* supports a finding that adding an arbitration clause to an ESCO's contract with consumers is a material change. There, the original contract between the plaintiff and the defendant ESCO required the ESCO to provide "30 days advance written notice of any *material change* to the Agreement." 2022 WL 17366626, at *1 (emphasis added). The ESCO purported to amend the contract by adding an arbitration provision and class action waiver, but provided no notice of these changes to the plaintiff. *Id.* at *2–3. Necessarily recognizing such changes are "material," this Court concluded that because the ESCO "neither *informed* Glikin that the attached contract was modified nor *warned* her to review the contract for changes . . . accepting Major's position would be the practical equivalent of writing

_____

it is not preempted by the Federal Arbitration Act. *See Kindred Nursing Centers Ltd. P'ship v. Clark*, 581 U.S. 246, 251 (2017) (the FAA does not displace "generally applicable" defenses and instead only preempts "legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue'" (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011))).

the notice of any material change provision out of the customer agreement." *Id.* at *4 (emphasis in original, quotation and alteration omitted).

Moreover, the New York legislature's statutory scheme that governs the formation of ESCOs' contracts with consumers —adopted in 2010, well after the *Aceros* decision— bolsters the conclusion that waiver of a consumers' ability to seek relief in Court, like mandatory arbitration provisions, are material. N.Y. Gen. Bus. L. § 349-d(10) explicitly provides a private right of action for consumer aggrieved by ESCOs like CleanChoice, and it provides specific remedies that a court may impose, including injunctive relief. Moreover, N.Y. Gen. Bus. L. § 349-d(8) prohibits customers from waiving any of GBL 349-d's provisions, which is exactly what the arbitration clause CleanChoice seeks to enforce does. The New York legislature clearly considered limitations on a consumer's right to bring claims to court "material." And the lengths to which Defendant has gone to enforce the alleged arbitration agreement demonstrates that it is clearly material to CleanChoice.

Because the arbitration agreement contained in the Subsequent Terms constitutes a material change to the Sudakow Contract, CleanChoice's failure to provide evidence of Ms. Sudakow's express consent as required by N.Y. Gen. Bus. L. § 349-d(6) provides this Court with alternative grounds to affirm the District Court's decision.

**B.    The Multiple Dispute Resolution Options In The Welcome
Package Contract Render The Arbitration Provision Voluntary.**

Even if the Subsequent Terms CleanChoice's allegedly sent after the Sudakow

Contract was executed bound Ms. Sudakow (they do not), CleanChoice still cannot

force her to arbitrate.  Those forms contain multiple dispute resolution options,

rendering the arbitration procedure addressed in the forms' "Choice of Laws"

paragraph voluntary, not mandatory.[8]  Thus, Ms. Sudakow's claims must remain in

court.

A mandatory arbitration agreement "must be clear, explicit and unequivocal

and must not depend upon implication or subtlety." *FFS Data Corp. v The OLB

Grp., Inc.*, 653247/2022, 2023 WL 2664717, at *4 (N.Y. Sup. Ct. Mar. 28, 2023)

(cleaned up).  But instead of memorializing such an express agreement, the

Subsequent Terms provide multiple dispute resolution options, scattered across

disparate paragraphs: "Complaint/Dispute Procedures;" "Regulatory Changes;" and

"Choice of Laws." JA-140, 141, 142.

The multiple options for dispute resolution provided reveal the non-

mandatory nature of the arbitration procedure on which CleanChoice's appeal relies.

Indeed, the "Complaint/Dispute Procedures" paragraph in CleanChoice's

Subsequent Terms—the obvious place to find out how to resolve disputes—does not

---

[8] Plaintiffs raised this argument below, JA-171–73, but the District Court did not
address it in the Opinion & Order.

even *mention* arbitration. JA-140. Instead, it lists two *other* dispute resolution options. First, the paragraph asks that consumers who have "any questions, concerns or complaints about [their] bill," "please" contact CleanChoice. *Id.* It then advises that the consumer "may" contact the New York Department of Public Service's Office of Consumer Service. *Id.* Nothing in the "Complaint/Dispute Procedures" purports to waive a consumer's right to bring claims in court. *Id.*

Nor does the "Complaint/Dispute Procedures" paragraph refer the consumer to the "Choice of Laws" paragraph found at the end of those terms. Yet CleanChoice's appeal relies on the "Choice of Laws" paragraph, because it contains the arbitration provision CleanChoice seeks to enforce. *See id.* It is utterly misleading for CleanChoice to draft form contracts that set forth voluntary dispute resolution mechanisms in a clearly labeled "Complaint/Dispute Procedures" paragraph and then later claim that an entirely different, non-contiguous paragraph (with an opaque title) actually contains the true—and required—dispute procedure. This too renders any purported arbitration agreement unenforceable. *See Sgouros v. TransUnion Corp.*, 817 F3d 1029, 1035–36 (7th Cir. 2016) (notice of arbitration agreement insufficient because notice "actively misleads the customer" and defendant company's misrepresentations "undid whatever notice it might have been furnishing in its bold text block by explicitly" misleading consumers). Indeed, the "Choice of Laws" paragraph's command that the parties "agree irrevocably and

unconditionally to settle any actions, complaints or disputes related to this contract or the transactions contemplated by this contract under the rules of the American Arbitration Association," JA-142, is fundamentally incompatible with the earlier direction that disputes be resolved by contacting CleanChoice or the New York Department of Public Service. Given this multi-option dispute resolution regime drafted *by CleanChoice*, the proposition that Ms. Sudakow agreed to *mandatory* arbitration of her disputes with CleanChoice is anything but clear and unequivocal. Thus, CleanChoice cannot force Ms. Sudakow into arbitration, even if the later-sent form contracts applied.

## <u>CONCLUSION</u>

The District Court's finding that CleanChoice did not provide notice of the arbitration clause to Plaintiff Sudakow, actual or inquiry, or that she assented to the arbitration clause was not erroneous. Defendant's appeal should therefore be summarily denied.

Dated: January 8, 2025

Respectfully submitted,

/s/ D. Greg Blankinship
 D. Greg Blankinship

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
D. Greg Blankinship
ONE NORTH BROADWAY, SUITE 900
WHITE PLAINS, NEW YORK 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
Daniel J. Brenner
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jbm@wittelslaw.com
djb@wittelslaw.com

*Attorneys for Plaintiffs and*
*the Proposed Class*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 11,470 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: January 8, 2025

     White Plains, New York

<u>/s/ D. Greg Blankinship</u>
D. Greg Blankinship
