# No. 24-1988

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

**ERIC WEINBERG,** *on behalf of themselves and all others similarly situated*, **ROBERT SUDAKOW,** *on behalf of themselves and all others similarly situated*, **JOANNE SUDAKOW,** *on behalf of themselves and all others similarly situated*,

*Plaintiffs-Appellees,*

v.

**CLEANCHOICE ENERGY, INC.,**

*Defendant-Appellant.*

On Appeal from the
United States District Court for the
Southern District of New York
No. 7:23-cv-09685
Hon. Philip M. Halpern

## APPELLANT'S REPLY BRIEF

Michael D. Matthews, Jr.
Diane S. Wizig
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
(713) 337-5580

Justin R. Chapa
MCDOWELL HETHERINGTON LLP
1000 Ballpark Way, Suite 209
Arlington, TX 76011
(817) 631-7561

*Attorneys for Defendant/Appellant*
*CleanChoice Energy, Inc.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ ii

PRELIMINARY STATEMENT .........................................................1

ARGUMENT ....................................................................................3

I.  APPELLEE, LIKE THE DISTRICT COURT, IMPOSES INCORRECT STANDARDS. ........................................................3

II.  THE ARBITRATION PROVISION IS VALID AND ENFORCEABLE BECAUSE CLEANCHOICE PROVED INQUIRY NOTICE AND IMPLIED ASSENT. ......................................6

    A.  Inquiry Notice was Unquestionably Established Under the Mailbox Rule, and Mrs. Sudakow Offers No Effective Rebuttal........................6

    B.  Mrs. Sudakow Implicitly Assented to the Arbitration Provision........13

III.  THE ARBITRATION PROVISION IS NOT INVALIDATED OR RENDERED VOLUNTARY BY OPERATION OF OTHER CONTRACT TERMS. ........................................................16

    A.  The Direct Mailer's "Regulatory Changes" Provision Does Not Bar the Arbitration Provision by Its Express Terms or Under *Glikin*. ......16

    B.  The Contract's Mention of Complaint Reporting Procedures Does Not Abrogate Its Mandatory Arbitration Provision. ..................................21

    C.  GBL 349-d Has No Bearing on the Outcome Here. ...........................25

CONCLUSION ................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*,
   282 F.3d 92 (2d Cir. 2002) ...............................................................8, 25, 28, 29

*AMF Inc. v. Brunswick Corp.*,
   621 F. Supp. 456 (E.D.N.Y. (1985)) .................................................................23

*Bochat v. Ambit Illinois LLC*,
   2025 WL 306326 (N.D. Ill. Jan. 27, 2025)........................................................18

*DIRECTV, Inc. v. Mattingly*,
   829 A.2d 626 (Md. 2003) .............................................................................19, 20

*Edmundson v. Klarna*,
   85 F.4th 695 (2d Cir. 2023) ...........................................................................5, 18

*EEOC v. Waffle House, Inc.*,
   534 U.S. 279 (2002)............................................................................................23

*Ferrostaal, Inc. v. M/V Tupungato*,
   2004 WL 2211658 (S.D.N.Y. Oct. 1, 2004)......................................................22

*Garrett v. Circuit City Stores, Inc.*,
   449 F.3d 672 (5th Cir. 2006) .............................................................................23

*Georgia Cas. & Surety Co. v. Excalibur Reinsurance Corp.*,
   4 F. Supp. 3d 1362 (N.D. Ga. 2014)..................................................................23

*Glikin v. Major Energy Elec. Servs.*,
   2022 WL 17366626 (2d Cir. Dec. 2, 2022)................................................*passim*

*I.K. Bery v. Irving R. Boody & Co.*,
   2000 WL 218398 (S.D.N.Y. Feb. 23, 2000) ................................................28, 29

*Krohn v. Spectrum Gulf Coast, LLC*,
   2019 WL 4572833 (N.D. Tex. Sept. 19, 2019) ...................................................9

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   597 F.3d 84 (2d Cir. 2010) ................................................................................10

*Manigault v. Macy's East, LLC*,
    318 F. App'x 6 (2d Cir. 2009) ...............................................................8

*In re Marlene Indus. Corp.*,
    380 N.E.2d 239 (N.Y. 1978)..............................................................27

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ...................................................................5

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)..........................................................................26

*Moore v. T-Mobile USA, Inc.*,
    2012 WL 13036858 (E.D.N.Y. Sept. 28, 2012), *aff'd* 548 F. App'x
    686 (2d Cir. 2013)..............................................................................23

*Panzer v. Verde Energy USA, Inc.*,
    507 F. Supp. 3d 606 (E.D. Pa. 2020)..................................................10

*Perry v. Thomas*,
    482 U.S. 483 (1987)..........................................................................27

*Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de
    Venezuela*,
    991 F.2d 42 ......................................................................................27

*Schnabel v. Trilegiant Corp.*,
    2011 WL 797505 (D. Conn. Feb. 24, 2011), *aff'd*, 697 F.3d 110
    (2d Cir. 2012)............................................................................*passim*

*Sgouros v. TransUnion Corp.*,
    817 F.3d 1029 (7th Cir. 2016) ...........................................................24

*Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17 (2d Cir. 2002) ...................................................................8

*Starke v. SquareTrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019) ...............................................................12

*Valle v. ATM Nat'l., LLC*,
    2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) .........................................9

*Weinberg v. CleanChoice Energy, Inc.*,
2024 WL 3446515 (S.D.N.Y. July 17, 2024)................................................3, 12

*Wolsey, Ltd. v. Foodmaker, Inc.*,
144 F.3d 1205 (9th Cir. 1998) ...........................................................................23

*Wright v. Greensky, Inc.*,
2021 WL 2414170 (S.D. Fla. June 14, 2021) ......................................................9

*Wu v. Uber*,
— N.E.3d —, 2024 WL 4874383 (N.Y. Nov. 25, 2024) ..........................4, 5, 15

*Yoshida v. Vista Energy Mktg. LP*,
2022 WL 88505 (E.D. Cal. Jan. 7, 2022) ...........................................................15

**Statutes**

NY Gen. Bus. Law § 349-d ........................................................................*passim*

Uniform Business Practices (UBP) § 5(B)(5)(d).................................................25

Uniform Commercial Code (UCC).................................................................28, 29

## PRELIMINARY STATEMENT

The central question on appeal is whether the undisputed facts establish that Mrs. Sudakow was on inquiry notice of and implicitly assented to the Contract, including its Arbitration Provision, as a matter of law. The parties nominally agree that the legal standard applicable to that question of contract formation is objective and that the standard of review this Court should employ is *de novo*. But because Appellee knows she cannot prevail under those standards, the Response repeatedly (and improperly) invokes subjective legal standards akin to express notice-and-assent. Appellee also invites this Court to review for clear error—despite failing to identify a single relevant fact dispute (none exist). Clear error and subjective, actual notice-and-assent are standards with no application here.

Under the appropriate standards, the Response offers no meritorious rebuttal to CleanChoice's showings that a reasonable customer in Mrs. Sudakow's position would be on notice of the Contract and that she assented to its terms through her actions. It instead: dwells on an issue not in dispute, i.e. that Mrs. Sudakow's return of the Enrollment Form created a contractual relationship; parses immaterial or non-existent factual distinctions between the cases relied on by CleanChoice and the circumstances here; tries to portray this Court's *Schnabel* and *Glikin* decisions as "binding" and directly applicable authority when they both involved markedly different circumstances and *Glikin* was decided under substantively different state

law; offers alternative grounds for relief that are either barred by well-established Supreme Court and Second Circuit precedent or contradicted by the Contract's plain language (or both); and insists that adding the Arbitration Provision was a "material change" in the face of binding authority holding it is not as a matter of law.

Applying "traditional contract principles," Resp. at 31, Mrs. Sudakow is charged with inquiry notice of her Contract's Arbitration Provision and impliedly consented to that and other terms based on the undisputed facts. CleanChoice carried its burden under the mailbox rule by showing the Contract was mailed to Mrs. Sudakow's address pursuant to CleanChoice's regular business procedures, entitling it to the presumption of receipt. The burden then fell to Mrs. Sudakow to identify evidence to rebut that presumption, but she did not. The Response tellingly fails to challenge any aspect of CleanChoice's practices or point to any competent evidence that the Contract did not arrive. Appellee cites only her husband's vague statement that "we" do not remember receiving the Contract, which is legally insufficient to rebut the presumption of receipt. And as to assent, Mrs. Sudakow impliedly accepted the Contract by failing to opt out in the weeks-long window between receipt and the start of her electricity service—and then affirmatively paying her bills for nearly a year. CleanChoice had no obligation to ensure Mrs. Sudakow had actual notice of the Arbitration Provision or to obtain her express assent via signature. Indeed, it did

not do those things for Mr. Weinberg, as to whom the District Court correctly granted CleanChoice's motion to compel arbitration.

CleanChoice respectfully asks the Court to reverse and remand with instructions to order Mrs. Sudakow's claims to arbitration.

## ARGUMENT

## I. Appellee, Like the District Court, Imposes Incorrect Standards.

Both the underlying Order and Mrs. Sudakow's Response pay lip service to the objective standards for inquiry notice and implied assent but do not apply them. As for the Order, the District Court's evaluation of the Arbitration Provision's enforceability was marred by its comparison of Mrs. Sudakow to Mr. Weinberg; it effectively holds CleanChoice to the elements for actual notice by applying a heightened standard using Mr. Weinberg's experience as the benchmark instead of an objective reasonable consumer's perspective. Specifically, the District Court found the Contract ineffectual for lack of notice because "the Sudakows, unlike Mr. Weinberg, were never notified by [CleanChoice] that they would be mailed additional or superseding terms and conditions." *Weinberg v. CleanChoice Energy, Inc.*, 2024 WL 3446515, at *7 (S.D.N.Y. July 17, 2024); JA-014 (criticizing CleanChoice because it "did not specifically call attention to the presence of the arbitration provision in the [Contract]" nor expressly reserved in the enrollment form "the unilateral right to modify the terms and conditions for any reason"). Thus, the

3

District Court's analysis plainly (and wrongly) held CleanChoice to a subjective standard requiring actual notice to the Sudakows.

The Response repeatedly encourages this Court to use the wrong standard too.[1] For example, it argues that CleanChoice should have obtained a "second signature" for the Contract, "specifically point[ed] out the new Arbitration Provision," or provided advance notice that additional terms would be forthcoming. *See, e.g.*, Resp. at 24–26. In other places, the Response asserts that, although "New York law sometimes allows assent to be manifested through silence or inaction," it does not do so "in the case of amended ESCO contracts." *Id.* at 42 (again arguing that CleanChoice should have obtained Mrs. Sudakow's signature on the Contract).

Those considerations are irrelevant to whether the Arbitration Provision is valid. As the New York Court of Appeals recently reiterated (in the arbitration context), "contract formation is governed by an objective rather than a subjective standard." *Wu v. Uber*, — N.E.3d —, 2024 WL 4874383, at *5 (N.Y. Nov. 25, 2024) ("Under well-established law, a person who accepts a written contract without first

_____

[1] The Response does so in two ways. First, as discussed, it tries to graft actual-notice requirements onto the inquiry notice analysis just like the District Court did. Second, and as an alternative ground for relief, the Response argues a heightened requirement of "express affirmation" applies here because ESCO arbitration-provision amendments are subject to New York General Business Law Section 349-d's requirement of the customer's "express consent" for material changes. CleanChoice addresses that latter (incorrect) position in Part III.C.

undertaking this review generally bears the risk that the agreement may contain provisions they do not like or expect.").[2] As explained below and in CleanChoice's opening brief, a proper objective analysis of the undisputed record necessarily results in enforcement of the Contract's mandatory Arbitration Provision.

Nor is there any merit to Appellee's argument that the District Court's legal determinations on notice and assent should be reviewed as fact determinations for clear error. *See, e.g.*, Resp. at 3, 13. As the Court knows, *de novo* review applies to notice-and-assent determinations where, as here, "the facts in th[e] case are undisputed[] and the district court determined" those issues as a matter of law with "no hearings" and "only limited development of the record[.]" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73, n.6 (2d Cir. 2017) (collecting cases); *see also Edmundson v. Klarna*, 85 F.4th 695, 709 (2d Cir. 2023) (holding that notice-and-assent were proven "as a matter of law" after conducting *de novo* review of "the undisputed

---

[2] The District Court and Appellee are misguided to cite *Schnabel* to suggest that assent requires proof that Mrs. Sudakow "manifested a ***subjective*** understanding of the existence of the arbitration and other [mailed] provisions and an intent to be bound by them." Resp. 41 (emphasis added). An objective standard for assent was employed in *Schnabel*, 697 F.3d at 110, 128 (2d Cir. 2012) ("In order to constitute acceptance, the failure to act affirmatively must carry a significance that reasonable people in the parties' positions would understand to be assent."). And in any event, the New York Court of Appeals' recent *Wu v. Uber* decision dispels any question over the relevant standard. 2024 WL 4874383, at *5 ("A binding contract requires an ***objective*** 'manifestation of mutual assent.'") (emphasis added) (cleaned up).

facts"). This appeal involves undisputed facts that the District Court assessed on the papers, so Appellee's invitation to review for clear error is misplaced.

On *de novo* review, this Court must review the undisputed facts using the appropriate objective standard and compel Mrs. Sudakow's claims to arbitration.

## II. The Arbitration Provision Is Valid and Enforceable Because CleanChoice Proved Inquiry Notice and Implied Assent.

Whether the Arbitration Provision is enforceable requires the Court to consider two separate but related questions: whether Mrs. Sudakow was on inquiry notice of the Contract's terms by way of the Welcome Package, and whether Mrs. Sudakow's subsequent actions manifested what reasonable parties would construe to be assent to the Contract and its Arbitration Provision.[3] Proper assessment of those questions under their governing objective standards reveals that CleanChoice met its burden on both notice and assent.

### A. Inquiry Notice was Unquestionably Established Under the Mailbox Rule, and Mrs. Sudakow Offers No Effective Rebuttal.

The Response offers essentially one overarching argument against a finding of inquiry notice here: application of *Schnabel v. Trilegiant Corp.*, 2011 WL 797505 (D. Conn. Feb. 24, 2011), *aff'd*, 697 F.3d 110 (2d Cir. 2012), which Appellee

---

[3] The Response begins with a lengthy detour focusing on a different issue: whether CleanChoice and Mrs. Sudakow formed a contractual relationship when she mailed in the Enrollment Form. As CleanChoice acknowledged in its opening brief (and as the Response observes), that fact is undisputed.

characterizes as factually and legally "quite similar to this case." Resp. at 32. But as CleanChoice already explained at length in its opening brief, that e-commerce case is fully distinguishable.[4]

Beyond its misplaced reliance on *Schnabel*, the Response gives no real rebuttal to the undisputed evidence that Mrs. Sudakow received the Contract—i.e., that she had inquiry notice of the Arbitration Provision as a matter of law. Rather, the Response suggests that CleanChoice had to do more without explaining why CleanChoice cannot avail itself of New York's "mailbox rule" like everyone else doing business in New York. Appellee gives three related reasons for that something-more contention, but none is supported by the facts or the law. First, she argues throughout that the Welcome Package's **five-page** Contract sent in an envelope stating "Important information" was not sufficiently conspicuous to put Mrs. Sudakow on inquiry notice that any of its provisions differed from the **one-page** terms summary provided with her enrollment form. Second, she contends that—despite the preexisting relationship between the parties at the time she received the Contract—the parties' "course of dealing" gave Plaintiff reason to believe that she would "receive mail" from CleanChoice, but not additional

---

[4] CleanChoice incorporates that discussion found in pages 31–36 of its opening brief here by reference.

contractual terms. Resp. at 22–23. And third, she briefly argues (again, without support) that CleanChoice did not follow industry practices. *Id.* at 23–24.

Mrs. Sudakow's desire to prevent application of the mailbox rule is understandable. CleanChoice indisputably marshaled sufficient evidence to come within the rule's presumption that she had inquiry notice of the Contract and its terms. But her efforts to avoid this presumption are unfounded and flawed. As explained in CleanChoice's opening brief, a party need not have actual notice of certain contract terms to be bound by them, and the mailbox rule provides one of the ways to meet objective notice and assent requirements under standard contract principles. If a party shows that it sent amended terms to an existing customer by "mail[ing] [the terms] to the party's address in accordance with regular office procedures," then the amendments may be effective even absent a signed document and other indicia of actual notice. *See, e.g.*, *Manigault v. Macy's East, LLC*, 318 F. App'x 6, 7 (2d Cir. 2009); *see also Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 97 (2d Cir. 2002) ("Indeed, we have specifically found that parties were bound to arbitrate under arbitration clauses they never signed . . . ."); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 31 (2d Cir. 2002) ("[R]eceipt of a physical document containing contract terms or notice thereof is frequently deemed, in the world of paper transactions, a sufficient circumstance to place the offeree on inquiry notice of those terms."). Appellee's insistence that CleanChoice had to do something

more than mail the Contract—which was conspicuously titled as such—to her is meritless.

All CleanChoice had to do to establish inquiry notice was provide "'affidavits as to [its] regular office mailing procedures' show[ing] that mail [containing the relevant contract] was properly addressed and delivered to the U.S. Postal Service." *Valle v. ATM Nat'l., LLC*, 2015 WL 413449, at *5 (S.D.N.Y. Jan. 30, 2015) (citation omitted); *see also Krohn v. Spectrum Gulf Coast, LLC*, 2019 WL 4572833, at *3 (N.D. Tex. Sept. 19, 2019) (same). CleanChoice established that it did so. *See* JA-117; JA-138–143; JA-217–218; JA-255; JA-257–266. The Response notably does not argue otherwise. CleanChoice thus presumptively provided Mrs. Sudakow with notice of the Contract's terms (including the Arbitration Provision) via inquiry notice. *See, e.g.*, *Wright v. Greensky, Inc.*, 2021 WL 2414170, at *14–15 (S.D. Fla. June 14, 2021) (applying mailbox rule to receipt of arbitration agreement where declaration "describe[s] the specific procedures Defendants use for preparing and mailing . . . and points to supporting evidence that Plaintiff received other billing statements that were mailed to her").

At that point, the burden shifted to Mrs. Sudakow to dispel inquiry notice by marshaling her own evidence. But all she provided was a legally insufficient statement from her husband that "we" do not remember receiving the Contract in the mail. JA-176–77. That will not do. *See* Br. 26–27. Even if the statement came from

9

Mrs. Sudakow herself, and even if it affirmatively denied receipt of the Contract, "mere denial of receipt" does not rebut CleanChoice's evidence of mailing and inquiry notice; Plaintiff had to "show that 'routine office practice was not followed or was so careless that it would be unreasonable to assume that notice was mailed.'" *See, e.g.*, *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010) (citation omitted). Appellee did not even try do so.

Blanket lack of recollection from a third party also contrasts with cases where plaintiffs successfully rebut the presumption. For example, in *Panzer v. Verde Energy USA, Inc.*, 507 F. Supp. 3d 606, 615 (E.D. Pa. 2020), the plaintiff (represented by Mrs. Sudakow's counsel) provided evidence of his practices for opening mail, which for the prior decade included electronically scanning and saving all mail but "junk mail." He further testified that his records did not contain the new terms with an arbitration provision that the defendant ESCO claimed to have mailed him. It was on that record that a district court determined there was rebuttal evidence "sufficient to destroy the presumption" of inquiry notice in an ESCO case. *Id*. at 616.

Further, Mrs. Sudakow cannot avoid inquiry notice via her Response's various arguments about conspicuousness, industry practice, and course of dealing. As the authorities cited in CleanChoice's opening brief demonstrate, it is common practice across many industries (including by ESCOs) to modify form consumer contracts by mailing updated terms and providing an opt-out period, just like

CleanChoice did here. And unlike *Schnabel*, there could be no confusion about the manner and place any updated terms would be sent. Indeed, the course of dealing here occurred **exclusively** by exchanging hardcopy documents through the mail. *See generally* Br. 22–41.

From an objective perspective, any reasonable consumer who recently mailed a form requesting electricity enrollment would have paid some attention to an envelope received soon thereafter with "Important information regarding your new clean energy subscription" on it and then read the Contract to see if the enrollment had been accepted and on what terms. And any reasonable customer under the circumstances would have understood based on the Welcome Package (and the envelope it came in) that the mailing involved the electricity service with CleanChoice to which Mrs. Sudakow had only recently subscribed. Mrs. Sudakow responded to the Direct Mailer by sending back the Enrollment Form, which was provided with a one-page term sheet applicable to CleanChoice's electricity service. Those materials clearly involved CleanChoice, and so any reasonable consumer would have expected that future communications about that enrollment and their "new clean electricity service" to come by mail and be from CleanChoice. And if any confusion remained, the enclosed cover letter was replete with CleanChoice branding, the five-page Contract was clearly and appropriately titled, and it provided yet another opt-out period as described in the top half of its first page. JA-257–65.

11

These undisputed facts stand in sharp contrast to circumstances where this Court finds inquiry notice lacking. For instance, in *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 297 (2d Cir. 2019), the Court affirmed denial of a motion to compel arbitration in an e-commerce case involving pre- and post-sale contracts. It did so because, while the plaintiff, "like any other offeree, had a duty to read" contract terms even if "provided post-sale," none of the documents the defendant sent to plaintiff was identified as a "Service Contract." *Id.* at 295. Here, however, the Contract was indisputably titled as such and arrived in an envelope addressed to Mrs. Sudakow that stated it contained "important information regarding [her] new clean electricity subscription" that she recently initiated also *by mail*. JA-260; JA-266.

At bottom, CleanChoice's motion was denied as to Mrs. Sudakow not because inquiry notice was lacking—but because it did not give her actual notice of the type that Mr. Weinberg received. *See Weinberg*, 2024 WL 3446515, at *7; JA-014 ("However the Sudakows, unlike Mr. Weinberg, were never notified by Defendant that they would be mailed additional or superseding terms and conditions."). Indeed, the District Court (and the Response) inappropriately use Mr. Weinberg's actual express notice as the measuring stick to determine whether it is reasonable to ascribe inquiry notice to Mrs. Sudakow. The error in that approach is self-evident. There is no legal principle that allows Mrs. Sudakow to evade inquiry notice simply because her co-plaintiff was given actual notice of forthcoming terms.

**B.    Mrs. Sudakow Implicitly Assented to the Arbitration Provision.**

With respect to assent, the Response claims it is unreasonable as a matter of law to infer Mrs. Sudakow's assent from the facts showing she received monthly bills charging her for CleanChoice's electricity supply service at the same address to which the Contract was sent, and that she paid those monthly bills for nearly a year (even questioning them at times). More specifically, Appellee argues that assent cannot be inferred from the "passive conduct" of bill payments. Resp. 42. But the payments at issue here were anything but passive. Plaintiff received monthly bills at the same address to which CleanChoice sent the Direct Mailer and Welcome Package Contract, and she concedes that she affirmatively paid every one of them. Under an objective standard, that course of dealing establishes either that Mrs. Sudakow read and understood mailings sent to her about her electricity service— further supporting a determination of notice and assent—or that she failed to read the Contract despite a legal duty to do so.

These facts differ starkly from *Schnabel*. There, the plaintiffs went online to do business with third parties and were presented with a pop-up box at the end of their transactions to enroll in services separately provided by the defendant. The plaintiffs provided no billing information to the defendant; the defendant instead obtained billing information from the third parties with whom plaintiffs knowingly enrolled. The defendant later emailed the plaintiffs contracts and then automatically

13

charged their credit cards. It is that conduct that this Court held was "too passive" to support a finding of implied assent. *Schnabel*, 697 F.3d at 128.

Indeed, the only similarity between this case and *Schnabel* is that the contractual terms were made available to plaintiffs in both instances, an argument that the *Schnabel* defendant waived. There, the defendant did make its terms available through a hyperlink on the enrollment page—similar to CleanChoice making the Contract available by mailing it directly to Mrs. Sudakow—but it failed to raise that argument. Importantly, this Court recognized that raising that argument (as CleanChoice does here) could have resulted in enforcement of the arbitration provision. *See* 697 F.3d at 129–30 (stating that "[t]he accessibility of the arbitration provision from a hyperlink on the enrollment screen, as appears to have been the case here, might have created a substantial question as to whether the provision was part of a contract between the parties"). Thus, unlike in *Schnabel*, the Arbitration Provision should be enforced in this case.

The Response also tellingly fails to deal with the fact that Mrs. Sudakow received the Contract ***before*** her service with CleanChoice began. Its recessionary period, therefore, supplied Mrs. Sudakow with yet another opportunity to opt out of the Contract's terms before she owed CleanChoice a dime. The reality is that Mrs. Sudakow chose not to opt out but instead accepted service under the Contract's terms for nine months. That is why her Response makes contradictory arguments on the

issue of timing. She in some places embraces the District Court's incorrect finding that the Contract "was both temporally and spatially decoupled from" the enrollment. Resp. at 28 (quoting JA-015). And yet she also faults CleanChoice for sending the Welcome Package soon after the Enrollment Form "to which she had so recently [ ] agreed." *Id*. at 25. Mrs. Sudakow's heads-I-win-tails-you-lose approach on the Contract's timing shows she has no real rebuttal to the critical fact that CleanChoice gave her an opportunity to rescind before her service began. Her failure to opt out and continued service for nearly a year constitute "objective manifestation of assent," as required under New York law. *Wu*, 2024 WL 4874383, at *5.

In short, Plaintiff failed to rebut CleanChoice's evidence of inquiry notice and, under the objective standard for assent, Mrs. Sudakow accepted the Contract's Arbitration Provision in the same manner as this Court and many district courts have deemed sufficient in myriad consumer contexts—including energy supply services. *See, e.g.*, *Yoshida v. Vista Energy Mktg. LP*, 2022 WL 88505, at *2–4 (E.D. Cal. Jan. 7, 2022) (applying mailbox rule and implied notice-and-assent standard to enforce arbitration provision in energy provider's mailed contract after plaintiff submitted enrollment documents that did not reference arbitration). On the other hand, *Schnabel* represents a factually incongruent situation involving e-commerce. It did not announce any broad legal rules requiring an actual notice and assent

approach for post-enrollment contract modifications. Under basic contract principles, the Contract and its Arbitration Provision are valid and enforceable.

## III. **The Arbitration Provision is Not Invalidated or Rendered Voluntary by Operation of Other Contract Terms.**

Cognizant that the Contract *generally* is enforceable, Mrs. Sudakow makes three alternative arguments against enforcing the mandatory Arbitration Provision *specifically*: (1) the Direct Mailer's "Regulatory Changes" provision somehow prevented CleanChoice from including the Arbitration Provision in the Contract; (2) the Contract's mention of non-litigation "Dispute Resolution" procedures purportedly bars the Arbitration Provision; and (3) the Arbitration Provision is a "material change" requiring written consent under New York General Business Law 349-d(6). Those arguments are unfounded and fail for the reasons below.

### A. **The Direct Mailer's "Regulatory Changes" Provision Does Not Bar the Arbitration Provision by Its Express Terms or Under *Glikin*.**

Relying exclusively on a case applying Maryland's substantive law, Mrs. Sudakow contends the Direct Mailer's "Regulatory Changes" provision barred CleanChoice from making *any* amendments unless (1) required by the circumstances specifically discussed in that section and (2) with 30-days' written notice of the changes. *See, e.g.*, Resp. at 31 ("As in *Glikin*, allowing CleanChoice to unilaterally modify the Sudakow Contract despite its failure to provide the contractually required notice (or base such modification on 'Regulatory Changes') 'would be the practical

equivalent of writing the' notice of modification provision out of the Sudakow Contract."); *see also Glikin v. Major Energy Elec. Servs.*, 2022 WL 17366626, at *1 (2d Cir. Dec. 2, 2022). Not so. Once again, Appellee urges the Court to adopt a strained reading of contractual terms unmoored from text and precedent.

The plain language of the "Regulatory Changes" provision belies Appellee's interpretation. It requires CleanChoice to give 30-days' notice when it must amend the Contract *due to changes in governing law beyond CleanChoice's control*. It reads, in full:

> This Agreement is subject to present and future legislation, orders, rules, regulations or decisions of a duly constituted governmental authority having jurisdiction over this Agreement or the services to be provided hereunder. **If at some future date there is a change in any applicable law, rule, regulation, tariff, market rule, or regulatory structure ("Regulatory Change") which impacts any term, condition or provision of this Agreement including, but not limited to price, CleanChoice Energy shall have the right to modify this Agreement to reflect such Regulatory Change by providing 30 days' written notice of such modification to You.** If CleanChoice Energy is prevented, prohibited or frustrated from carrying out the terms of this Agreement, in its sole discretion, CleanChoice Energy will have the right to cancel this Agreement by giving notice to You as required under applicable law.

JA-141 (emphasis added).

The Regulatory Changes provision has nothing to do with this case. It does not mention arbitration. It contains no language that possibly could be construed to preemptively limit CleanChoice to amending or modifying the parties' agreement

17

*only* when Regulatory Changes occur. And it imposes no free-standing obligation on CleanChoice to give customers 30-days' notice of *every* amendment it might ever propose. It requires advance notice only for modifications caused by "Regulatory Changes" that "impact[] any term, condition or provision" of the agreement. *Id.* Appellee never argued below—and does not now—that CleanChoice included the Contract's Arbitration Provision in response to a Regulatory Change. CleanChoice thus had no duty to give express advance notice under the irrelevant Regulatory Changes provision.[5]

The Response nevertheless analogizes it to the notice provision in *Glikin*, but that case cannot do the work the Response asks of it. In *Glikin*, this Court considered whether modifications to an ESCO's service agreement made three years into the parties' relationship were effective where the original agreement specified that the

---

[5] A district court recently came to the same conclusion after plaintiffs (represented by Appellee's counsel) argued a regulatory changes provision was an "'express limitation' that banned all amendments other than when one of the enumerated [regulatory or statutory] changes occurred." *Bochat v. Ambit Illinois LLC*, 2025 WL 306326 (N.D. Ill. Jan. 27, 2025). The district court disagreed because, "[o]rdinarily, parties to contracts can amend them for any reason (so long as the requisites for contract formation exist)." *Id.*; *see Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702-03 (2d Cir. 2023) (concluding that "traditional contract formation law does not vary meaningfully from state to state" and therefore relying on "the contract-law principles of other states" to decide arbitrability).

customer would receive advanced written notice of any "renewal terms" or "material change to the Agreement." 2022 WL 17366626, at *1 (quoting agreement). Despite these requirements, the renewal notice mailed to the customer did not identify or discuss any differences between the renewal agreement and the then-current agreement, even as the notice informed the customer that they could "'automatically renew'" their plan simply by "Do[ing] Nothing." *Id.* The notice contained a four-page "Residential and Small Commercial Disclosure Statement and Terms of Service" document that differed in several respects from the customer's then-current agreement, one of which was addition of an arbitration agreement. *Id.* When the customer later sued, the ESCO filed a motion to compel arbitration, which was denied. *Id.*

This Court affirmed. *Id.* at *2. But it did so not because it held that the arbitration provision amendment was a material change—as the Response would have it—but based on peculiarities of Maryland law that require an amending party to do more than provide a copy of a new (but different) contract to comply with "'notice of changes provisions in a customer agreement.'" *See id.* at *1 (applying and quoting rule from *DIRECTV, Inc. v. Mattingly*, 829 A.2d 626, 636–37 (Md. 2003)). As this Court explained, "[i]n *DIRECTV*, Maryland's highest court specifically rejected the argument . . . that merely enclosing a copy of the text of the new agreement was sufficient to comply with the notice provision" included in an

original agreement. *Id.* Under the approach mandated by Maryland law, the presence of a notice provision requires the amending party to expressly "let the customer 'know when a change occurred and what that changed entailed.'" *Id.* (quoting *DIRECTV*, 826 A.2d at 634).

It was in this context that the *Glikin* court held the ESCO's position "'would be the practical equivalent of writing the notice'" provisions out of its contract. *Id.* (citation omitted). The ESCO provided no notice that the renewal contract differed from the original contract that had been in place and under which plaintiff received service *for three years*. The accompanying cover letter simultaneously suggested that plaintiff did not have to take any affirmative action to continue service on their current terms. It thus could not, under Maryland law, "effect a valid contractual modification" at all—not just as to the arbitration provision. *Id.*

*Glikin* thus has no salience even assuming New York law would recognize the same rule (and the Response cites no authority holding it does). The ESCO in *Glikin* promised to give advance notice of essentially ***any*** change to its existing contract, with 45-days' notice for "renewal" changes and 30-days' notice for material changes. *See id.* The ESCO there nonetheless gave ***no*** cognizable notice under Maryland law; it simply mailed a different contract and represented in its cover letter that the customer needed to take no action to maintain service.

The Direct Mailer contained no similar provision. It committed CleanChoice to giving advance notice only of amendments for Regulatory Changes, which the Arbitration Provision indisputably was not. *Glikin* thus is not binding precedent requiring CleanChoice to "'*inform[]* [Mrs. Sudakow] that the attached contract was modified []or *warn[]* her to review the contract for changes.'" Resp. at 31. The Arbitration Provision is enforceable.

### B.  The Contract's Mention of Complaint Reporting Procedures Does Not Abrogate Its Mandatory Arbitration Provision.

The Response next argues that the Contract's inclusion of "multiple dispute resolution options" somehow "render[s]" the arbitration provision "voluntary, not mandatory." Resp. 47–48. In Appellee's view, the Arbitration Provision cannot bind Mrs. Sudakow because it appears in the "Choice of Laws" provision rather than the section titled "Complaint/Dispute Procedures." *Id.* at 48. Appellee's argument lacks merit and, unsurprisingly, the Response offers no relevant authority to support it.

There is nothing misleading about the Arbitration Provision's location in the Contract. A cursory read of the "Complaint/Dispute Procedures" paragraph's two sentences shows that it concerns run-of-the-mill billing complaints raised outside of litigation. The first sentence reasonably instructs customers with "any questions, concerns or complaints ***about [their] bill***" to "contact [CleanChoice's] Customer Care Representatives" and provides a toll-free phone number and email address that can be used to raise such concerns. JA-140 (emphasis added). "If for any reason

[customers] are not satisfied with [CleanChoice's] response," the second sentence informs them that they "may contact the New York Department of Public Service, Office of Consumer Services" and identifies three methods by which customers may do so. *Id.* Nothing in the "Complaint/Dispute Procedures" paragraph remotely suggests that the two specified mechanisms to resolve billing disputes are also the appropriate places to assert legal claims in litigation.[6]

By contrast, clear language expressly covering that form of dispute resolution appears in the Arbitration Provision. It states that "[b]oth [the customer] and CleanChoice Energy *agree irrevocably and unconditionally* to settle any actions, complaints or disputes *related to this contract or the transactions contemplated by this contract* under the rules of the American Arbitration Association (AAA)." JA-142 (emphasis added). This language is "'explicit and unequivocal'" and does "'not depend on implication or subtlety.'" Resp. at 47 (citation omitted). Nor can it be read to "permit the exercise of jurisdiction by another forum." *See, e.g.*, *Ferrostaal, Inc. v. M/V Tupungato*, 2004 WL 2211658, at *1 (S.D.N.Y. Oct. 1, 2004). Arbitration is, therefore, mandatory.

---

[6] Appellee also characterizes the "Regulatory Changes" provision as a "dispute resolution option," but fails to identify any part of it that could be construed to provide a forum to resolve complaints or assert legal claims. Resp. at 47.

The Response points to no authority holding that arbitration provisions are mandatory only if they appear in specific sections or use particular language. That is because courts have long held that enforceability of arbitration provisions does not hinge on the use of "'magic words.'" *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1208 (9th Cir. 1998) (quoting *AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456, 460 (E.D.N.Y. (1985)); *see also Moore v. T-Mobile USA, Inc.*, 2012 WL 13036858, at *2 (E.D.N.Y. Sept. 28, 2012) (enforcing arbitration provision in section titled "Customer Acceptance" with FAA referenced in choice-of-laws provision), *aff'd* 548 F. App'x 686, 687 (2d Cir. 2013) (rejecting argument that arbitration clause was invalid because contract was unsigned and allegedly unilateral). The "Choice of Laws" section is a natural place to include arbitral language, moreover, because courts consider arbitration provisions to be "procedural" terms akin to venue- and forum-selection clauses. *See, e.g.*, *Garrett v. Circuit City Stores, Inc.*, 449 F.3d 672, 678 (5th Cir. 2006) ("An agreement to arbitrate under the FAA is effectively a forum selection clause[.]" (citing *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 295 (2002))); *Georgia Cas. & Surety Co. v. Excalibur Reinsurance Corp.*, 4 F. Supp. 3d 1362, 1370–71 (N.D. Ga. 2014) (distinguishing between effect of merged arbitration and choice-of-laws provisions and those appearing in separate sections).

The Response cites just one case to support its argument that the Contract's "multiple dispute resolution options" somehow "actively misleads the customer,"

23

*Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035–36 (7th Cir. 2016). But *Sgouros* is yet another inapposite case from the e-commerce context, and it did not even address language from an arbitration provision. It concerned whether a plaintiff could be compelled to arbitration by merely ordering a credit report from a website whose language "told the user that clicking on the box constituted his authorization for [the defendant] to obtain his personal information" but said "nothing about contractual terms." *Id.* at 1035. In that situation, the Seventh Circuit held that **the website language** was "actively mislead[ing]" because it did not clearly indicate that clicking the link also "constituted acceptance of [a] Service Agreement" that contained an arbitration provision. *See id.* at 1035–36. Although the first few lines of the 10-page service agreement appeared on the website in a scrollable box, the website layout and language led customers to believe "that clicking served a particular purpose unrelated to the Agreement." *Id.* at 1036. The *Sgouros* court therefore had no need to—and did not—consider the import of any arbitration provision language; like the plaintiffs in *Schnabel*, the *Sgorous* plaintiff lacked notice that they had entered **any** contract at all with the defendant.

The Contract and circumstances here are, again, a far cry from those in e-commerce cases like *Sgorous* and *Schnabel*. Mrs. Sudakow knowingly asked to enroll with CleanChoice, understood that she had established a contractual relationship with CleanChoice after it accepted her enrollment, and actively made

payments for its electricity service for nine months thereafter. The Contract's arbitration provision contains language unequivocally making arbitration mandatory and the exclusive forum to resolve contract and other claims in litigation. No meritorious reason exists for discarding the Arbitration Provision or viewing arbitration as voluntary here.

### C. GBL 349-d Has No Bearing on the Outcome Here.

Finally, the Response contends that New York law "foreclose[s]" the Arbitration Provision's enforceability because GBL 349-d(6) requires ESCOs to obtain express consent for any material change to the parties' agreement. Resp. at 44. Appellee's GBL-based argument fails primarily because there is no support for her contention that the addition of the Arbitration Provision was a material change. Quite the opposite, this Court has held that Supreme Court precedent mandates that "arbitration agreements do not, as a matter of law, constitute material alterations to a contract." *Aceros*, 282 F.3d at 100. Additionally, the Uniform Business Practices (the "UBP") promulgated by New York's Public Service Commission—the agency charged with implementing GBL 349-d—says that changes to commodity rate, product type, and service type constitute material changes. UBP, § 5(B)(5)(d). None of those enumerated terms were changed by the Contract, and obviously missing from that list of material changes is mention of an arbitration requirement.

The Response offers two reasons why the Court should nonetheless use GBL 349-d to invalidate the Arbitration Provision. First, in an argument Appellee did not raise below, she argues that this Court "[n]ecessarily recogniz[ed] such changes are 'material'" as a matter of law in *Glikin*. Resp. at 45. Second, she asserts that the "statutory scheme" in GBL 349-d precludes ESCOs from obtaining a "waiver of a consumers' ability to seek relief in Court" because it "provides a private right of action" and "prohibits customers from waiving any of [its] provisions." *Id.* at 46.

Taking the latter contention first, Appellee fundamentally misunderstands the interplay between private rights of action and arbitration. A legislature's decision to provide a private right of action statutorily creates a ***claim*** that parties may assert in litigation—in whatever forum a dispute may be brought. Absent express statutory language to the contrary, a private right of action does not vest exclusive jurisdiction in a specific ***forum***. In fact, the Supreme Court rejected the Response's position 40 years ago, explaining that, "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985).

GBL 349-d's private right of action simply has no bearing on the Arbitration Provision's enforceability. It does not expressly vest jurisdiction in courts or bar mandatory arbitration. The Response notably does not argue that Appellee would

26

somehow be precluded from asserting her statutory claims in arbitration. Nor does any language in the Contract suggest that enforcing its arbitration provision will somehow divest Appellee of her statutory right to bring GBL 349-d claims.

*Glikin* does not counsel otherwise. As explained above in Part III.B, *Glikin* stands for the unremarkable proposition that a party proposing to amend a contract must do more than send a revised copy to its customer *if* the existing contract requires advance notice of the changes at issue. *See* 2022 WL 17366626, at *1. If an existing contract contains such a notice provision, then—for contracts governed by Maryland law—the amending party must identify and describe the proposed amendments to the counterparty before the amendments can be effective. *See id.*

Nowhere in *Glikin* did this Court suggest that amendments to add arbitration provisions "[n]ecessarily" are material contract modifications. Resp. at 45. New York law once held as much. *In re Marlene Indus. Corp.*, 380 N.E.2d 239, 242 (N.Y. 1978). But that has not been the law for several decades. This Court expressly concluded that approach did not survive the Supreme Court's holding in *Perry v. Thomas* that the FAA preempts per se state-law rules that require courts to interpret the enforceability of arbitration agreements "'in a manner different from that in which it otherwise construes nonarbitration agreements.'" *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42. 46 (2d Cir. 1993) (quoting 482 U.S. 483, 492 n.9 (1987)). Appellee's request that the Court interpret

*Glikin* and GBL 349-d to impose such a rule—and require express consent to arbitration-provision amendments—directly contravenes this precedent.

Even still, the Response argues that the FAA would not preempt a construction of GBL 349-d that automatically makes arbitration amendments one of the "material change[s]" subject to Section 349-d(6)'s express-consent requirement because the GBL has general application. But that circular reasoning defies logic. Any law or rule of construction that imposes a per se materiality standard to arbitration amendments necessarily requires disparate treatment of such amendments vis-à-vis those that do not concern arbitration. "[T]he FAA, as interpreted by the Supreme Court, prohibits such discriminatory treatment of arbitration agreements." *I.K. Bery v. Irving R. Boody & Co.*, 2000 WL 218398, at *5 (S.D.N.Y. Feb. 23, 2000). And again, this Court has rejected Appellee's argument directly, holding that "arbitration agreements do not, as a matter of law, constitute material alterations to a contract." *Aceros*, 282 F.3d at 100.

The Response suggests in passing that the Court may still determine an arbitration provision's materiality "'on a case-by-case basis,'" although perhaps not under the "specific standards of materiality" described in UCC cases. Resp. at 45 (quoting *Aceros*, 282 F.3d at 99–100). But this argument also does not advance Appellee's cause. The Response fails to develop it any further (thereby waiving it)

or to grapple with the fact that the case-by-case approach it proffers *is* the UCC standard for assessing the materiality of arbitration amendments.

Under that standard, the burden falls to Appellee to prove materiality as the party "that opposes inclusion," which requires establishing by a preponderance of the evidence that her lack of "express awareness" of the arbitration provision resulted in "surprise or hardship." *See Aceros*, 282 F.3d at 100 (cleaned up; citations omitted); *Bery*, 2000 WL 218398, at *5–6. The Response neither identifies any such evidence nor even contains the terms "surprise" or "hardship," and the standard requires more than generic "'profession[s] of surprise and raised eyebrows.'" *Aceros*, 282 F.3d at 100 (citation omitted). Accordingly, even if the Court were inclined to conduct a one-off assessment of materiality here—which it should not— Plaintiff fails to carry her burden.

Try as she might, Plaintiff cannot import actual-knowledge or express-consent principles applicable to material contract amendments into the immaterial Arbitration Provision here. CleanChoice established that Mrs. Sudakow had inquiry notice of the Arbitration Provision and impliedly consented to it. Arbitration of her claims should now be ordered.

## CONCLUSION

The District Court's order denying CleanChoice's Motion to Compel Arbitration of Mrs. Sudakow's claims should be reversed and the case remanded

with instructions to grant the motion, order the parties to arbitrate as contractually agreed, and stay the proceedings until arbitration has concluded.

Dated: January 29, 2025                    MCDOWELL HETHERINGTON LLP

                                           */s/ Michael D. Matthews, Jr.*

                                           Michael D. Matthews, Jr.
                                           Diane S. Wizig
                                           Justin R. Chapa

                                           *Counsel for Defendant/Appellant*
                                           *CleanChoice Energy, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the word limits of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this document contains 6,983 words consisting of 6,983 words counted by the software used to prepare this brief, and 0 additional words contained in pdf screenshots not counted by that software.

2.    This brief complies with the type-face and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

<u>*By: /s/ Michael D. Matthews, Jr.*</u>
Michael D. Matthews, Jr.
